**Volume 1 of 2**

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellant,</u>

v.

PAUL WAYNE DERRICK,
<u>Defendant-Appellee.</u>

DALE L. DUTREMBLE; E. BART
DANIEL; RICHARD GREER,
<u>Amici Curiae,</u>

and

CHARLESTON POST AND COURIER,
<u>Movant.</u>

No. 97-4230

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellant,</u>

v.

JEFFERSON MARION LONG, JR., a/k/a
Bud,

<u>Defendant-Appellee.</u>

No. 97-4231

DALE L. DUTREMBLE; E. BART
DANIEL; RICHARD GREER; ALVA
TAYLOR BROWN, Personal
Representative of the Estate of
LUTHER LANGFORD TAYLOR;

NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS,
Amici Curiae,
and

CHARLESTON POST AND COURIER,
Movant.

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

LARRY BLANDING,
Defendant-Appellee.

DALE L. DUTREMBLE; E. BART
DANIEL; RICHARD GREER; ESTATE OF
BENJAMIN J. GORDON, JR., a/k/a B. J.

Gordon; ALVA TAYLOR BROWN,
Personal Representative of the
Estate of LUTHER LANGFORD TAYLOR;
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS,
Amici Curiae,

and

CHARLESTON POST AND COURIER,
Movant.

No. 97-4232

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Falcon B. Hawkins, Chief District Judge.
(CR-91-91-FBH, CR-91-384-FBH, CR-90-434-FBH)

Argued: May 7, 1998

Decided: November 23, 1998

2

Before WIDENER, NIEMEYER, and LUTTIG, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Luttig wrote the opinion, in which Judges Widener and Niemeyer joined. Judge Widener wrote a separate concurring opinion.

_____

**COUNSEL**

**ARGUED:** Elizabeth Dorsey Collery, Appellate Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Dale L. DuTremble, Charleston, South Carolina; Gedney Main Howe, III, Charleston, South Carolina, for Amici Curiae DuTremble, Daniel and Greer. Joel Wyman Collins, Jr., COLLINS & LACY, P.C., Columbia, South Carolina; Jack Bruce Swerling, Columbia, South Carolina, for Appellees. Marvin David Miller, Alexandria, Virginia; Lionel S. Lofton, Charleston, South Carolina; Joel W. Collins, Jr., COLLINS & LACY, P.C., Columbia, South Carolina, for Amici Curiae Association, Gordon, and Estate of Taylor. **ON BRIEF:** John C. Keeney, Acting Assistant Attorney General, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. James E. Bell, III, BELL & MOORE, Sumter, South Carolina, for Appellee Blanding. Lisa B. Kemler, ZWERLING & KEMLER, Alexandria, Virginia, for Amicus Curiae Association.

_____

**OPINION**

LUTTIG, Circuit Judge:

Appellant, the United States of America, appeals from the order of the federal district court for the District of South Carolina, dismissing with prejudice five indictments returned in the aftermath of the so-called Operation Lost Trust investigation into political corruption in the South Carolina Statehouse in the early 1990s. For the reasons that

3

follow, we vacate the opinion of the district court and remand with instructions that the dismissed indictments be reinstated.

I.

This case arises from an FBI investigation into political corruption in the South Carolina legislature in connection with its consideration in 1990 of the state's parimutuel betting legislation. That investigation resulted in the prosecution and conviction by jury of the defendants -- Larry Blanding, Paul Wayne Derrick, and Jefferson Marion Long, Jr.[1] -- for various offenses, including extortion under color of official right and conspiracy to commit extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951. Defendants Blanding's and Derrick's convictions (as well as Taylor's and Gordon's) were eventually overturned by this court on appeal on the grounds that the intervening Supreme Court decisions in McCormick v. United States, 500 U.S. 257 (1992), and Evans v. United States, 504 U.S. 255 (1992), rendered defective the jury instructions that were given at their trials. See United States v. Blanding, 1992 WL 138353 (4th Cir. No. 91-5871); United States v. Derrick, 1994 WL 34691 (4th Cir. No. 92-5084). We affirmed the district court's award of a new trial to defendant Long based upon the improper playing of inadmissible tape recordings before his jury. United States v. Long, 1994 WL 56993 (4th Cir. No. 92-6799). Accordingly, all three cases were remanded to the district court for retrial.

Upon remand, defendant Taylor moved for dismissal of his superseding indictment, which had also included defendants Gordon and Blanding, on the grounds of discovery violations and other alleged prosecutorial misconduct. And in response to these allegations of improper withholding of documents and other wrongdoing, the government decided essentially to "start over on discovery by providing it again." United States v. Taylor , 956 F. Supp. 622, 626 n.4 (D.S.C.

_____

[1] Two other original defendant-appellees to this appeal, Luther Taylor and B.J. Gordon, are now deceased. Taylor passed away on March 23, 1997, and Gordon passed away on July 12, 1997. Consequently, neither of these individuals is a party to this appeal. By order of the court, however, we granted the estates of both of these defendants the opportunity to participate as amicus curiae.

4

1997) (district court order dismissing defendants' indictments) (quoting 10/18/94 OPR Report at 10). This decision having been made, the government produced to the defendants "all [FBI] 302s that mentioned any co-conspirator named in the new indictment as well as all pre-trial Jencks Act materials." J.A. at 2688. This production on November 29, 1993, prompted defendant Gordon also to move for the dismissal of his indictment on the grounds that the government had improperly withheld materials required to be produced under Brady v. Maryland, 373 U.S. 83 (1963).

On February 22, 1994, the district court granted the government's motion for continuance in order to allow the Department of Justice's Office of Professional Responsibility (OPR) to investigate the defendants' allegations of prosecutorial misconduct. That investigation, which disclosed no intentional misconduct by the prosecution in these cases, was concluded in October of 1994. Although the Department of Justice found that the prosecution had not engaged in any intentional wrongdoing, the United States Attorney for South Carolina recused his office from further involvement, and attorneys from Public Integrity at Main Justice assumed responsibility for prosecution of the cases.

Thereafter, at an October 20, 1994, status conference, the government agreed to produce to the defendants all FBI 302s and transcripts in its possession relating to the investigation, reserving the right to seek in camera review by the court of any materials the government believed should not be produced. J.A. at 1334, 1341. The district court also ordered the government to produce any existing handwritten interview notes. J.A. at 1348. All of these materials were to be surrendered by December 1, 1994, into the evidence room established by the district court. J.A. at 1352-53 (district court discovery order). Pursuant to its promise at the status conference, the government placed a large number of documents in the evidence room. Additionally, acting upon its reservation of right, the government submitted a number of FBI 302s to the court for in camera inspection and argued that they should not be produced to the defendants.

In January and February of 1995, the prosecution learned that the FBI had in its possession tape recordings and FBI 302s relating to the 1988-89 drug investigations of prosecution witness Ron Cobb. Upon

5

learning of these materials, the prosecution obtained these documents and turned them over to the defendants.

Following the above-described productions, the defendants proposed to the court at its April 19, 1995, hearing on pending discovery motions, that

> the government take every scrap of paper that they have, every internal memorandum, every piece of correspondence, every doodle pad, every videotape, every transcript, every audio tape, everything, put it in the room.

J.A. at 1364-65. (The same day, defendant Derrick filed a motion to dismiss his indictment.) And the following day, over the government's objections that it had already produced far more documents than required by Brady and federal rules, the district court issued an order "[t]o avoid any further confusion as to what material should and should not be turned over by the government to the .. . defendants." J.A. at 1418, 1419. That order required the government to produce for in camera inspection by May 8, 1995, "all documents and/or materials in [its] possession . . . dealing with these cases and not presently available to the defendants in the `evidence room'." J.A. at 1420. In compliance with the court's order, the government produced, according to the district court, seven file boxes from the Department of Justice, four file boxes from the FBI, and one file box from the Office of Professional Responsibility. See J.A. at 1422.

In a July 25, 1995, discovery order entered following its in camera review of the materials produced pursuant to its earlier orders, the district court concluded that the government's argument that the drug-related audiotapes produced in March of 1995 were not relevant or discoverable under Brady was "ludicrous" because "the drug investigation was hand-in-glove with the corruption investigation known as Lost Trust." J.A. at 1427. Arguments such as the one made by the government, the district court said, "cause the court to look very closely at what was withheld by the government that may have jeopardized the rights of these defendants." J.A. at 1427. The court also concluded that documents relating to corruption in connection with the capital gains legislation (as opposed to the parimutuel betting legislation that was the subject of the Lost Trust sting operation) were

6

relevant to the defendants' defense because "one of the key figures in the Lost Trust investigation pled to a RICO violation, one of the predicate offenses of which was the taking of a bribe from the government's cooperating subject and key Lost Trust witness, Ron Cobb, in relation to the capital gains tax bill." J.A. at 1428.

As to the documents submitted by the government for in camera inspection, the district court concluded they were

> in the main, internal administrative documents constituting privileged work products, or are documents that are part of the public record in these cases, or are copies of documents known by this court to have been previously furnished to defendants. The court has found few additional materials therein to which it believes these defendants are entitled under either Brady or within the meaning of the "open file policy" in effect in this district.

J.A. at 1430 (emphasis added). The court ordered the government to produce but ten specific documents in addition to OPR interview notes. J.A. at 1440.

The district court subsequently amended its July 25 discovery order a number of times, including once on September 7, 1995. In its September 7 amended order, the court ordered "that should the government come into possession of any evidence which might impact on the alleged capital gains cover-up, such information and/or materials shall be immediately submitted to this court for in camera review." J.A. at 1457. In response to this amended order, the government inquired, J.A. at 1542, and was informed by the FBI that Special Agent Denton had located, "on the 14th floor of the Strom Thurmond Federal Building in a section of files known as closed files," J.A. at 1540, an investigative file for the capital gains matter.[2] The government notified the court that it had found this file, placed some of the

_____

[2] Special Agent Denton testified:

> I noticed on one of the files a file number that was not the Lost Trust file, it was down at the bottom of an empty 302, and it had the Lost Trust file number on it and it had another file number.
>
> . . .
>
> It turns out it was the capital gains file, which was not indexed capital gains.

J.A. at 1542.

7

documents in the evidence room, and, on October 4, 1995, submitted other documents for in camera review by the court. In an order dated October 6, 1995, the district court indicated that the submitted documents "should have been furnished long ago" and, acknowledging that it had "made only a cursory in camera review of the documents," ordered them produced to the defendants. J.A. at 1460.

On October 18-20, 1995, the court conducted an evidentiary hearing on the defendants' claims of prosecutorial misconduct. During this hearing, which related primarily to the capital gains investigation, Special Agent Denton, after testifying that the FBI maintained "cooperating witness" files, was asked to search his files again for any files relating to Ron Cobb. In conducting this review, Denton found an FBI 302 on Robert Kohn, which was generated after the defendants' trials and which he produced to the defendants. Rejecting the defendants' suggestion that this document had been intentionally withheld, the district court stated:

> [O]ut of the thousands and thousands of documents that's passed through this court, I'm not surprised that there's one that got overlooked, or lost, or whatever it is. . ... Now, I had not seen that last 302 that was found, and I don't know if it contains anything that would warrant anybody trying to intentionally hide it. I have already heard the agent say that he didn't intentionally do it. He doesn't know how it got misplaced, but he found it, and he gave it up.
>
> I guess he would have been better off if he had just acted like he didn't find it, but I think he's trying to comply with the court's orders, and there have been several of these things that have come up after a more thorough investigation.

J.A. at 1929.

At the conclusion of the hearing, the district court said that it wanted to re-review the boxes of documents that it had already reviewed in camera and had said in its July 25, 1995 order need not be produced. On February 6, 1996, the court ordered that all of these documents be produced to the defendants, reasoning that "little, if

8

anything, contained therein can still be classified as `sensitive'," "a wider latitude must be given with regard to materials to be furnished for the purposes of the defendants' pursuit of their motions to dismiss for prosecutorial misconduct than might be given for trial preparation," and that "no prejudice will inure to the government should this court order all of these documents furnished to the defendants." J.A. at 1946-47.

On October 3, 1996, the district court reconvened the hearing on defendants' motions to dismiss their indictments, and thereafter received additional briefing in support of and in opposition to the motions to dismiss. And, on February 3, 1997, the district court entered its order dismissing the defendants' indictments with prejudice pursuant to its supervisory power.

Rejecting the government's contention that the dismissal of the indictments would be unauthorized absent a specific finding that the alleged prosecutorial misconduct prejudiced the defendants, the district court stated:

> The court is convinced that the totality of the government's actions in these matters rises to the level of egregious prosecutorial misconduct, and that this is a sufficient finding on which the court can exercise its supervisory power.
>
> . . .
>
> The government would argue that in using its supervisory power the court must find pattern and prejudice, and that the defendants have proven neither. The court agrees that the circuits are in disarray on this subject, but believes there is sufficient precedent to dismiss the subject indictments without addressing these issues.

956 F. Supp. at 623; see also id. (district court concluding that "it has the discretion under the doctrine of the court's supervisory power to dismiss should it find the government's actions so outrageous as to offend the sensibilities of the court").[3] From the district court's order

———————————————————————————————

[3] The district court summarized its beliefs as to the prosecution's misconduct as follows:

9

dismissing the defendants' indictments pursuant to its supervisory power, the United States appealed.**4**

II.

As the United States vigorously asserts, the district court's dismissal of the defendants' indictments without a finding of prejudice is directly contrary not only to the precedent of this court, but also to clear and well-established Supreme Court precedent. As the Supreme Court held in United States v. Hasting , 461 U.S. 499 (1983), a court's "supervisory powers to discipline the prosecutors of its jurisdiction" may not be invoked to reverse a defendant's conviction for prosecutorial misconduct where the alleged misconduct was harmless. Id. at 505. In Hasting, the Seventh Circuit had,"notwithstanding the harmless nature of the error," id. at 504, reversed the defendants' convictions because the prosecutor had commented on the defendants'

_____

> The court is convinced that this investigation began in an appropriate fashion. It is, after all, the responsibility of the FBI and the USAO to pursue information with regard to illegal acts within their jurisdiction. It is the opinion of the court, however, that some of the investigators and lead prosecutors got lost on their way to the lofty goal of weeding out drugs and corruption from the South Carolina State House. Overzealousness and political pressure upon those in positions of authority appear to be the detours that led the government to rush to trial, especially in the cases of Taylor, Blanding and Gordon; to withhold volumes of exculpatory evidence; to allow perjured testimony to stand uncorrected on more than one occasion; to allow its primary cooperating witness, Cobb, to take an unusual amount of control of the sting operation; to go outside of its own regulations to target certain legislators, and to mislead this court to such an extent as to perpetrate a fraud upon the court.

956 F. Supp. at 658.

**4** By orders of this court, former prosecutors E. Bart Daniel and Dale L. DuTremble, joined by Richard Greer, were permitted to participate in this appeal as amicus curiae, as were the estates of Luther Taylor and Benjamin Gordon. The brief filed by Daniel, DuTremble, and Greer will be referred to throughout as the brief of the "prosecutors amici."

10

failure to testify in violation of <u>Griffin</u> v. <u>California</u>, 380 U.S. 609 (1965). The Court of Appeals had, through its reversal of the convictions, sought "to discipline the prosecutor -- and warn other prosecutors -- for what it perceived to be continuing violations of <u>Griffin</u>" within the circuit. <u>Hasting</u>, 461 U.S. at 504. The Supreme Court, however, reversed, holding that a court's supervisory powers may not be invoked to evade the harmless error rule for constitutional violations[5] because "the interests preserved by the doctrine of harmless error" -- including the interest of the victims in seeing the defendants brought to justice and the public's interest in the "prompt administration of justice" -- "cannot be so lightly and casually ignored in order to chastise what the court viewed as prosecutorial overreaching." <u>Hasting</u>, 461 U.S. at 507, 509, 505. The Court reasoned that invocation of the "[s]upervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since by definition, the conviction would have been obtained notwithstanding the asserted error." <u>Id</u>. at 506. The Court also noted that concern for "the integrity of the process carries less weight" when the error is harmless because there is "no `reasonable possibility' that [it] contributed to the conviction." <u>Id</u>. (quoting <u>Fahy</u> v. <u>Connecticut</u>, 375 U.S. 84, 86-87 (1963)). Finally, the Court explained, "deterrence is an inappropriate basis for reversal where, as here, [the constitutional violation is at best "attenuated"] and where means more narrowly tailored to deter objectionable prosecutorial conduct are available." **6** <u>Id</u>. (footnotes omitted).

It would seem to follow, <u>a fortiori</u>, from the Court's holding in <u>Hasting</u> that a court may not, without finding prejudice to the defendant, exercise its supervisory power to reverse a defendant's conviction and require a retrial based upon prosecutorial misconduct, that a court may not dismiss an indictment altogether on this ground without also finding prejudice. The dismissal of an indictment altogether clearly thwarts the public's interest in the enforcement of its criminal laws in an even more profound and lasting way than the requirement

_____

**5** **See Chapman** v. <u>California</u>, 386 U.S. 18 (1967).

**6** The Court noted that more narrowly tailored means of deterrence included "order[ing] the prosecutor to show cause why he should not be disciplined," "asking the Department of Justice to initiate a disciplinary proceeding against him," or "publically chastis[ing] the prosecutor by identifying him in its opinion." <u>Hasting</u>, 461 U.S. at 506 n.5.

11

of a retrial. And, indeed, in Bank of Nova Scotia v. United States, 487 U.S. 250 (1988), the Court reaffirmed its analysis in Hasting and squarely held that a court has "no authority to dismiss the indictment on the basis of prosecutorial misconduct absent a finding that petitioners were prejudiced by such misconduct." Id . at 263.

Defendants apparently contend that the Court's holding in Nova Scotia applies only to prosecutorial misconduct that occurs at the grand jury stage.**7** See Appellee's Br. at 93. However, although the misconduct at issue in Nova Scotia did occur before the grand jury, see id. at 254 ("[A]s a general matter, a district court may not dismiss an indictment for [prosecutorial misconduct] in grand jury proceedings unless such errors prejudiced the defendants."), both the Court's analysis and the text of its opinion confirm that Nova Scotia's holding applies equally to prosecutorial misconduct that occurs at the pre-trial and trial stages of a prosecution.

Specifically, the Court reasoned that all federal courts are bound by Federal Rule of Criminal Procedure 52(a) to conduct the harmless-error inquiry and that a "court may not invoke supervisory power to circumvent" that inquiry. Id. at 254-55. As the Court explained, "[t]he balance struck by [Rule 52(a)] between societal costs and the rights of the accused may not casually be overlooked `because a court has elected to analyze the question under the supervisory power.'" Id. at 255 (quoting United States v. Payner, 447 U.S. 727, 736 (1990)). Thus, the Court held broadly that "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant," Nova Scotia, 487 U.S. at 255.

Other Supreme Court cases likewise confirm that a court's supervisory power cannot be exercised to dismiss indictments for government misconduct absent a showing of prejudice to the defendants. See, e.g., United States v. Morrison, 449 U.S. 361, 365-67 (1981) (holding that dismissal of an indictment was an inappropriate remedy for an alleged Sixth Amendment violation that did not prejudice the defendant, even though the conduct of the government agents was "egregious"); id. at 365 ("[A]bsent demonstrable prejudice or substan-

_____

**7** The district court in this case made no findings of prosecutorial misconduct before the indicting grand jury. See Appellees' Brief at 93.

12

tial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." (footnote omitted)); cf. United States v. Payner, 447 U.S. 727, 733 (1980) (holding that district court cannot invoke its supervisory power to circumvent the Fourth Amendment standing rules by excluding evidence seized illegally and in bad faith by the government in violation of a third party's -- but not the defendant's -- constitutional rights).

We, too, have consistently recognized that an indictment may not be dismissed for prosecutorial misconduct absent a showing that the misconduct prejudiced the defendant. See, e.g., United States v. McDonald, 61 F.3d 248, 253 (4th Cir. 1995) (holding that indictment should not be dismissed for alleged prosecutorial misconduct before the grand jury that did not prejudice the defendant because "[t]he United States Supreme Court has recognized . . . that an indictment may be quashed on the basis of prosecutorial misconduct, but only where the government's misdeeds `substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations'" (quoting Nova Scotia, 487 U.S. at 256) (internal quotation marks omitted)); United States v. Lee, 906 F.2d 117, 120 (4th Cir. 1990) ("[T]he district court erred in dismissing the indictment [based on the prosecution's failure to produce a defense witness, who was allegedly "within government control,"] because, as the Supreme Court has explained, `absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.'" (quoting Morrison, 449 U.S. at 365; citing Nova Scotia, 487 U.S. at 254)); United States v. Hastings, 126 F.3d 310, 317 (1997) (holding that, although the government's improper refusal to comply with a discovery order warranted sanctions, dismissal of the indictment was "an extreme and inappropriate sanction" where the only prejudice to defendant was "inconvenience and slight expense of delays").

And virtually every other circuit to consider the issue post-Hasting and Nova Scotia has also held that an indictment may not be dismissed based on prosecutorial misconduct, absent a showing of prejudice to the defendant. See, e.g., United States v. Van Engel, 15 F.3d 623, 631-32 (7th Cir. 1993) ("A federal judge is not authorized to punish the misconduct of a prosecutor by letting the defendant walk,

13

unless the misconduct not only violated the defendant's rights but also prejudiced his defense, and neither condition is satisfied here."); United States v. Santana, 6 F.3d 1, 11 (1st Cir. 1993) ("[T]aken together, Payner, Hasting, and Bank of Nova Scotia form a trilogy admonishing federal courts to refrain from using the supervisory power to conform executive conduct to judicially preferred norms by dismissing charges, absent cognizable prejudice to a particular defendant."); United States v. Isgro, 974 F.2d 1091, 1097 (9th Cir. 1992) ("In its recent jurisprudence . . . the Supreme Court has moved . . . toward a rule that a court should not use its supervisory powers to mete out punishment absent prejudice to a defendant."); id. ("Hasting thus unequivocally rejects the idea that a court may sanction the government for its misconduct without considering first the actual prejudice suffered by the defendant.").

The district court ignored entirely this impressive body of established Supreme Court and appellate court caselaw, failing even to cite to a single one of the cases discussed above. Instead, the district court relied on a number of district court cases -- all of which predated Hasting or Nova Scotia or both, and most of which are easily distinguishable from the present case in any event. See 956 F. Supp. at 657-59, citing to United States v. Omni Intern Corp., 634 F. Supp. 1414 (D. Md. 1986) (dismissing indictment without prejudice); United States v. Fischbach & Moore, Inc., 576 F. Supp. 1384, 1396 (W.D. Pa. 1983) (denying defendant's motion for release of grand jury transcripts because there was no evidence that the government abused the grand jury process and "no indication of actual prejudice to defendant"); United States v. Lawson, 502 F. Supp. 158, 172 (D. Md. 1980) (dismissing indictment without prejudice); United States v. DeMarco, 407 F. Supp. 107 (C.D. Cal. 1975); United States v. Banks, 383 F. Supp. 389 (D.S.D. 1974). Additionally, the district court relied on three circuit court cases. Two of these predated Nova Scotia, see 956 F. Supp. at 658, citing United States v. Serubo, 604 F.2d 807 (3d Cir. 1979), and United States v. Hogan, 712 F.2d 757 (2d Cir. 1983),**8** and the other failed even to cite Nova Scotia or Hasting, see United States

_____

**8** **Hogan** is also easily distinguishable from the case at hand, because the court in that case found that the error was not harmless: "If not for the clear prejudice resulting from the AUSA's misconduct, appellants might not have been indicted." 712 F.2d at 762 n.2.

14

v. Kojayan, 8 F.3d 1315 (9th Cir. 1993). **9** Obviously, none of the cases cited by the district court can overcome the force of the controlling Supreme Court authority requiring the district court to find prejudice to the defendants before dismissing indictments based on prosecutorial misconduct.

It is hardly surprising, however, that even in the face of these precedents, the district court declined to make any findings that the defendants were, in fact, prejudiced. As the district court itself noted, the bulk of the misconduct it identified related to discovery violations, and the defendants now have all of the discovery materials to which they could possibly be entitled -- and considerably more -- available to them for use at their retrials. Thus, any prejudice that arguably existed as a consequence of discovery violations is fully remedied by this court's orders of new trials. See United States v. Borakinni, 748 F.2d 236, 237 (4th Cir. 1984) (rejecting defendant's claim that his indictment should have been dismissed because the government failed to produce exculpatory material at his first trial because, even "assuming [defendant] was entitled to the materials at his first trial, his remedy for the government's failure to furnish them was a new trial, not an acquittal"). Similarly, any prejudice to defendants at their original

_____

**9** The district court also cited to McNabb v. United States, 318 U.S. 332 (1943), for the proposition that the "government's misconduct `need not be so unfair or imprudent as to offend "due process" before exercise of this [court's] supervisory power is appropriate.'" 956 F. Supp. at 658. (Although the district court's citation suggests that it was quoting McNabb, the quoted phrase does not appear in McNabb). In McNabb, the Supreme Court exercised its "supervisory authority over the administration of criminal justice in the federal courts," McNabb, 318 U.S. at 341, to exclude confessions obtained under oppressive circumstances in "flagrant disregard" of the statutory duty imposed by Congress on law enforcement officers promptly to take a person arrested before a judicial officer who can determine the sufficiency of the justification for detention, id. at 344-45. McNabb provides no support for the district court and defendants' contention that the supervisory power can be exercised generally (much less exercised to dismiss indictments) to discipline the government in the absence of prejudice to the defendants, for the Court clearly viewed the government tactics employed in McNabb as both prejudicial to the defendants and in clear "violation of [their] legal rights." Id. at 346.

15

trials that might have resulted from the other alleged misconduct of the government would also be fully cured by retrial.

Defendants contend, nonetheless, that the district court's dismissal of the indictments was proper because, although the district court found it unnecessary to address whether there was a "pattern" of prosecutorial misconduct, see 956 F. Supp. at 623, it in fact found a pattern of misconduct, cf. id. at 657 (finding that the government's discovery errors "amounted to a pattern of conduct"), and such a pattern is sufficient alone to justify dismissal of the indictments even without a finding of prejudice to the specific defendants before the court. For this contention, the defendants presumably rely upon the Court's statement in Nova Scotia that it was

> not faced with a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment.

487 U.S. at 259; see also Morrison, 449 U.S. at 365 n.2 ("[W]e note that the record before us does not reveal a pattern of recurring violations by investigative officers that might warrant the imposition of a more extreme remedy in order to deter future lawlessness."); Santana, 6 F.3d at 11 (noting that the Court may have left open the possibility that the requirement of prejudice is qualified if the misconduct "is plainly improper, indisputably outrageous, and not redressable through the utilization of less drastic disciplinary tools"). This language may suggest that, despite the Court's broad language and reasoning in Hasting and Nova Scotia, the Court has not entirely foreclosed the possibility that a pattern of prosecutorial misconduct could be so entrenched and pervasive that it would justify dismissal of indictments without a finding of prejudice to defendants.**10** Even if

_____

**10** The Supreme Court did not explicitly suggest in Nova Scotia, however, that a finding of systematic prosecutorial misconduct was an alternative to finding prejudice as a justification for dismissing indictments. Rather, the Court made its statement in the context of "review[ing] the record to set forth the basis of [its conclusion] that prejudice has not been established," Nova Scotia, 487 U.S. at 257, suggesting that it might consider, as a subset of the prejudice inquiry, whether a history of prosecu-

16

such an exception to the requirement of prejudice exists, however, we doubt that the Court would apply it where, as here, alternative sanctions -- including publicly chastising the attorneys and recommending them for disciplinary proceedings -- were available to the court and were not employed prior to dismissal of the indictments. Cf. Hasting, 461 U.S. at 506 n.5 (noting that the court should select "more narrowly tailored" means to deter objectionable prosecutorial misconduct). However, because the district court's findings can be read to suggest a pattern of serious prosecutorial misconduct that spans at least these several related cases, we have, at the urging of the United States and of the defendants, undertaken a painstaking review of those findings. And, as we explain more fully below, the record does not even support the district court's individual "findings" of prosecutorial misconduct, much less that there has been an established pattern of prosecutorial misconduct in these cases that would justify the extraordinary sanction of the dismissal of the defendants' indictments.

III.

A careful parsing of the district court's lengthy opinion reveals that the district court relied for its scores of conclusions as to wrongful withholding of material exculpatory information and other prosecutorial misconduct largely upon only the defense claims of intentional wrongdoing, rather than upon an independent analysis of the record evidence. That is, the district court often merely recites that the defendants contended that certain materials should have been produced,

_____

torial misconduct had jeopardized grand jury independence, id. at 257-59. And, indeed, Hasting suggests that even a longstanding and pervasive pattern of prosecutorial misconduct does not justify dismissing indictments without a finding of prejudice to the defendants. See 461 U.S. at 504 (rejecting the Seventh Circuit's attempt to discipline the prosecutors in its jurisdiction by dismissing indictments despite the Seventh Circuit's findings that the circuit's prosecutors generally "failed to heed the court's prior admonitions" and engaged in the charged misconduct with "disturbing frequency"); see also Morrison, 449 U.S. at 367 (characterizing the government conduct, which was insufficient to justify dismissing the indictments without a finding of prejudice, as "egregious").

17

without itself drawing conclusions as to whether, as a matter of law, the production was required. For example, the district court does not even purport to determine whether any of the assertedly withheld information was material to the defense, cumulative of information already provided, or readily available to the defendants -- all of which are necessary inquiries under Brady and Giglio v. United States, 405 U.S. 150 (1972). In fact, the district court only infrequently makes factual "findings" at all; its opinion rests mostly on implication and innuendo, and much of this is as to matters either extraneous to the proceedings pending before the court or beyond the purview of the federal courts in general. And, when the court does make such findings -- none of which are based upon credibility assessments -- they are, almost without exception, wholly conclusory: The court either does not explain the basis for the findings or offers what can best be characterized as only a superficial and incomplete analysis of the record evidence. Indeed, in a number of instances, as we explain, the district court simply erred in its assertion that material was not produced and, in still others, contradicted its own findings and assessments earlier in the proceedings as to whether production was required. The same shortcomings appear in those portions of the district court's opinion in which it charges the government with misconduct other than the wrongful disclosure of information. As with the document disclosure portions of its opinion, the district court often did not even make factual "findings" as that term is conventionally understood, employing mere inference and innuendo instead.**11** When the court did make findings, almost never

_____

**11** We discuss these instances fully below, but, for example, rather than explicitly "finding" that Special Agent Clemens and Assistant United States Attorney Barton perjured themselves by denying the existence of an FBI 302 discussing the capital gains matter, the district court merely implies such perjury by observing that the subjects of the 302 in question were "big fish" whose mention in a 302 "would certainly have been noticed." 956 F. Supp. at 640-41. In like fashion, the district court never made a finding that SA Clemens perjured himself concerning the late-night visit by him and Cobb to Smith's house; rather, the court said only that Smith's testimony "indicate[d] that SA Clemens . . . was not entirely truthful in his testimony." 956 F. Supp. at 648 (emphasis added). So also did the court imply but not actually find that the government's investigation into the capital gains matter was inadequate, noting only that the government's actions "suggest a total avoidance of pursuing information

18

are they adequately supported. And, oftentimes, the district court itself, earlier in the litigation, had specifically rejected the claims of prosecutorial wrongdoing that it ultimately recited as a basis for its decision to dismiss defendants' indictments.

No doubt many of these errors may be ascribed to the simple fact that the district court became overwhelmed by the sheer volume of documents (and other evidence) in this dispute and by the countless individual claims of entitlement that had to be adjudicated in the course of these decade-long proceedings. Even the government and the defendants themselves were overwhelmed by the magnitude of the litigation. That the district court may have become overwhelmed by this protracted litigation, however, did not relieve that court of the ultimate obligation to fully support its conclusions with evidence

_____

that might have proved adverse to Greer." 956 F. Supp. at 660 (emphasis added). And, although the district court seemed convinced that Greer had perjured himself, it was apparently unprepared to make a specific finding to that effect, noting instead that Greer's testimony "would have to be perjured" unless, "[a]lternatively, . . . the government . . . lied to the court" at Greer's sentencing hearing." Id . Finally, in some instances, although implying findings, the district court actually expressly declined to make "specific findings" at all, as it did with regard to Cobb's truthfulness in testifying that United States Attorney Daniel authorized Cobb to characterize a $10,000 payment to Senator Lindsay as attorney's fees. Id. at 649.

When, on the infrequent occasions the court did make a factual finding and it is possible to identify the finding as such, it is often impossible to ascertain as to whom or to what conduct the finding was made, see, e.g., id. at 660 (seemingly finding that the government had suborned perjury "in several instances," but without identifying whether the referenced perjury was committed by Cobb only or also by Greer and Clemens); compare id. (characterizing Cobb's testimony as"perjurious several times over") with id. (stating that Clemens "apparently, felt he had to play out the scenario to the end", but without characterizing testimony as "perjurious") (emphasis added), id. (stating that Greer either perjured himself or the government lied to court), and id . (finding that the government "allow[ed] testimony from Cobb, Clemens and Greer that it knew to be untrue to stand uncorrected" but without characterizing testimony by three as "perjurious") (emphasis added).

19

from the record before it. That obligation is always incumbent upon the court and is heaviest where, as here, the court charges a party litigant with intentional wrongdoing. Upon careful review of the district court's opinion, and of the individual charges of misconduct recited therein, we are convinced that this obligation simply was not properly discharged by the district court.[12]

_____

[12] At oral argument before this court, we asked defense counsel and counsel for the government whether they would agree that the nine categories of misconduct recited by the United States at page 25 of its principal brief comprised the bulk of the district court's "findings" of prosecutorial misconduct. Both counsel agreed that virtually all of the misconduct grounds addressed by the district court were included within these categories, a fact confirmed by our own exhaustive review of the record. Accordingly, the court has generally addressed itself only to these categories and the individual assertions of misconduct incorporated within these categories. These categories, as they appear on page 25 of the government's brief, are as follows:

> (1) Failing to disclose FBI 302 reports in which Cobb indicated that he had made payments to other legislators to keep them friendly and expressed uncertainty about whether such payments were "bribes." J.A. 234-36.

> (2) Failing to disclose other exculpatory evidence, including tape recorded conversations. J.A. 236-40, 274-77.

> (3) Allowing Cobb to commit perjury by testifying, without correction, that he had never given Senator Lindsay any "bribes or illegal money." J.A. 244-54.

> (4) Presenting testimony from an FBI agent who falsely denied that he had prepared a report relating to Cobb's payoffs to Lindsay in connection with the Capital Gains tax, and having an AUSA falsely represent to the court that no report of this interview existed. J.A. 247-49.

> (5) Placing a 2:00 a.m. telephone call to Senator Lindsay, and then falsely testifying that the purpose of this call was merely to warn Lindsay of upcoming negative publicity. J.A. 261-71.

> (6) Permitting Richard Greer, the former head of the South Carolina State Development Board, falsely to deny his knowledge of the capital gains bribery scheme to the grand jury investigating that matter. J.A. 254-61.

> (7) Failing adequately to investigate the capital gains matter, and avoiding the pursuit of any information that could prove adverse to Greer. J.A. 254-61, 294-95.

20

A.

The district court ultimately concluded that "much of the government's misconduct actually stem[med] from its failure to disclose evidence to the defendants." 956 F. Supp. at 659. Said the court:

> The withholding of such a voluminous array of discovery which the government had to know was exculpatory and relevant to the defenses of these defendants is unprecedented before this court. The court finds that these violations are too numerous and too specific to certain issues to be considered simply unintentional or the result of neglect.

Id. at 658-59; see also id. at 657 (rejecting the Office of Professional Responsibility's finding that "incremental mistakes and misjudgments" by the FBI and prosecutors, and not "intentional and wrongful decisions to conceal," caused the discovery failures).[13]

_____

> (8) Withholding evidence of Cobb's drug usage both before and after his employment by the government. J.A. 271-74.

> (9) Allowing Cobb to take control of the sting operation and to target particular legislators in violation of regulations that required him to act more passively. J.A. 277-80.

Br. of United States at 25.

[13] Apparently to emphasize exactly how numerous the violations were, the district court noted that "[i]n undisputed testimony . . . the court was informed that prior to his trial Taylor received only 66 of the 550-plus-or-minus 302s and 26 of the 227-plus-or minus tapes that are now in defendants' possession. The number of 302s and tapes received pretrial by the other defendants would vary only slightly." 956 F. Supp. at 657. What the district court failed to acknowledge, however, was that -- by its own admission -- the vast majority of the documents the government has produced to the defendants on remand are completely and indisputably irrelevant to the defendants' cases. See J.A. at 1520 (district court noting that "at least 90 percent" of the documents produced in camera and later provided to the defendants "really has no relevance as to what we are here about now"). The government's failure to produce, prior to defendants' trials, "volumes" of irrelevant documents to which the defendants were not legally entitled certainly cannot be viewed as error, much less "egregious prosecutorial misconduct."

21

1.

Underlying much of the district court's reasoning that the government had wrongfully withheld material exculpatory information was the court's apparent belief that the case was tried under a so-called "open file policy," pursuant to which the government agreed to turn over essentially all of its documents to the defendants in return for the comfort of knowing that neither Brady nor Giglio would be relevant throughout the protracted proceedings. Thus, the district court began its entire opinion detailing what it perceived to be the "egregious prosecutorial misconduct" as follows:

> From the outset, these cases were to be tried under what is referred to in this district as an "open file policy." During its tenure on the bench, this court has conducted numerous criminal trials under this policy and never before has its interpretation been so challenged as in the government's present arguments. As a lawyer and a judge, this court's experience has been that "open file" meant that the government's entire discovery file would be made available to the defendants for their examination. . . . It has long been established that when an "open file" policy is declared, the dictates of Brady and Giglio as well as Bills of Particular, become extraneous; all discovery material, except as limited to privileged work product, is made available to the defendants. This would have come as no surprise to USA Daniel or his assistants, most of whom had prosecuted cases before this court on numerous occasions.

> [M]otions to dismiss for prosecutorial misconduct had been filed by one or another of these defendants during the preparation and pendency of their original trials in 1990 and 1991. One of the primary grounds on which those motions and the more recent motions are based is the wilful withholding of Brady and other exculpatory material.

956 F. Supp. at 632.

Notwithstanding these statements in the district court's order, it is evident from the record that the government never agreed to conduct

22

these prosecutions under an "open file policy" in the sense that the district court suggested in its order of dismissal. Not only did the defendants each file numerous discovery requests under Brady, and motions for bills of particular, but the district court closely supervised the discovery, meticulously and painstakingly hearing, considering, and adjudicating each individual dispute. Indeed, as the government notes, the defendants themselves "essentially abandon[ ] the district court's theory about the `open file' policy." Reply Br. of United States at 16; see also Reply Br. of Prosecutors Amici at 4; Br. of Appellees at 20 ("Whether or not there was an`open file policy,' the government had clear obligations to comply with Brady v. Maryland, Rule 16, Federal Rules of Criminal Procedure and 18 U.S.C. § 3500 (the Jencks Act).").

Both the prosecution and the defense proceeded on the understanding throughout the pretrial and trial proceedings that the government had not opened its files in the manner suggested by the district court. The prosecution made clear early on, in September of 1990, that it only intended to provide those materials required by rule and statute:

> The Defendant's "motion for Bill of Particulars" is tantamount to a general discovery request and the majority of the matters inquired about are not properly requested by way of a bill of particulars. However, the United States does recognize its obligations to provide the Defendant with certain information pursuant to Rule 16 of the Federal Rules of Evidence and 18 U.S.C. 3500, and the United States intends to conduct discovery in this case in an `open file' manner to the extent that all matters discoverable pursuant to Rule 16 [of the Federal Rules of Criminal Procedure] and 18 U.S.C. § 3500 will be provided to the Defendant prior to trial.

J.A. at 317 (United States Response to Taylor's Motion for Bill of Particulars); see also J.A. at 415-17 (reading same into record at court's request at October 1990 hearing). At the Blanding hearing on November 19, 1990, the government again repeated its position that it was not proceeding generally under an open file policy:

> COURT: Do you have an open file policy here?

23

[PROSECUTION]: Well, your honor, I'm always hesitant to say that, in view of the discovery motions that I see coming forward. Everything that they are entitled to discover under Rule 16, everything under 18 U.S.C. 3500, and anything the government intends to use at trial, I have produced for them.

J.A. at 531-32. And, as late as April 1991, during the Derrick trial, the government continued to assert that it was conducting discovery in the case in an open file manner only "to the extent that all matters discoverable under Rule 16 and Title 18, United States Code, Section 3500 will be provided to the defendant," J.A. at 887 (United States Response to Defendant's Motion for Discovery and Inspection), withholding documents which it believed were not producible under either the rule or the statute, id. at 888-94 (United States Response to Defendant's Supplemental Motion for Discovery and Inspection).

The defense, through defendant Taylor's counsel, likewise stated repeatedly that it did not believe that the government had opened its files in the manner believed by the district court. During the court's October 19, 1990, hearing, in response to the court's observation that the defense could not have both an open file policy and a bill of particulars, Taylor's counsel, Joel Collins, stated:

> I think I understand what you are saying by that, Your Honor. Let me just say I have never believed that we were operating under an open file policy.

J.A. at 420; see also id. at 419 (Taylor's counsel stating his understanding that the case was being tried under bills of particular). And, again in October of 1994, Taylor's counsel repeated his view that there was no open file policy:

> MR. COLLINS: I have never operated on the assumption that there was an open file policy after some time in October of 1990 --
>
> THE COURT: But you talked like you think it's one.

24

> MR. COLLINS: We think there ought to be one now, Your Honor.

J.A. at 1321.

Finally, it is clear from the district court's own statements and actions that -- even if it mistakenly believed such initially -- not even the court believed throughout the proceedings that the government had an open file policy, or, at least an open file policy of the kind suggested in its 1997 order. As early as 1990, after extended discussion of the issue on the record with counsel, the district court concluded that, although it had been confused to that date, the parties in fact had not agreed to an open file policy:

> THE COURT: Skip on down there to where you get to the part you are telling me that you all are having an open door like policy and that you are not responding to his bill of particulars. What I guess I am trying to say if they have been laboring certainly we haven't in 100 percent kept up-- we have been kind of treating it like it was open file policy when he keeps saying he didn't get this and that, and I have been making you all give it to him. With a bill of particulars we don't get involved in any of that.
>
> MR. DANIEL (reading from prior submission by government): . . . "[T]he United States does recognize its obligations to provide the defendant with certain information pursuant to Rule 16 of the Federal Rules of Evidence and 18 U.S.C. Section 3500. And the United States intends to conduct discovery in this case in an `open file' manner to the extent that all matters discoverable pursuant to Rules 16 and 18 U.S.C. 3500 will be provided to the defendant prior to trial."
>
> . . .
>
> THE COURT: I guess what I am trying to get to, Mr. Collins, if we are operating under a bill of particulars case, we are doing things one way. I thought we were operating

25

under an open file case. Once you get the responses to that bill of particulars, then you are stuck, he is stuck, everybody is stuck. That is what the case is all about.

. . .

I am becoming more and more in favor of bill of particulars myself. I know the U.S. Attorney's Office and most defendant's lawyers become more and more opposed to them because it closes out a lot of things that could come to light with an open file policy. I guess my question to you right now is, is it your understanding this case is being tried under this bill of particulars?

MR. COLLINS: Yes, sir, it sure is. The government--

THE COURT: You don't have to tell me anymore.

MR. COLLINS: May I make a further response to what the U.S. Attorney said?

THE COURT: You can make another response. I am just trying to close it on down and narrow up what we are doing. I wanted you to make sure you are aware as to what you might be narrowing yourself down to. An open file, as you know, is completely different from trying a case under a bill of particulars.

. . .

THE COURT: What I am telling you is that by them responding to the bill of particulars and what they told you that is the only obligation they have in this case from their own. That is why you have to be very particular about the questions that you ask in your request for the bill of particulars, that you just can't -- I guess you can't have an open file policy and a bill of particulars.

MR. COLLINS: I think I understand what you are saying by that, your Honor. Let me just say I have never believed that we were operating under an open file policy. . . .

26

THE COURT: What I am getting at is I don't know whether that came about as a result of me laboring under the theory you all were working under an open file policy or whether in the bill of particulars you particularly asked what tapes they were going to use.

. . .

THE COURT: I guess what I am trying to tell you. I don't know because I stopped fooling with the bill of particulars and started treating it like it was an open file policy. They might not have to give you those tapes. I don't know whether they do or not. I have to go back to the bill of particulars and see what kind of parameters have been set up, and bound to be set up for the trial of this case. That is what the bill of particulars is all about. You asked the questions and they give you the answers, and both sides are stuck with that and the case goes to trial.

. . .

THE COURT: . . . I was kind of putting you on notice if in fact some of these other things, and I don't know how protected or unprotected they are, if we are operating under the bill of particulars, then the court's rulings up to this point might not necessarily have confined the government to the bill of particulars. I may have gone outside of what they had to do because I thought, and I guess through an error of mine, that we were operating under an open file policy. That is about it.

. . .

THE COURT: I may have to do some backtracking now because I was under the opinion we were operating under the open file policy. From here on forward I am going to this bill of particulars. I don't think anything I ruled earlier could have prejudiced the defendant, and I don't know what might be coming in the future. You heard me say this more

27

than one time in other cases. I have about come to the conclusion it is a lot better for the court to make a case operate under a bill of particulars rather than fool around with so called open file policies. That way we can eliminate a lot of Brady problems. A lot of problems we can eliminate. That is all. I just want to know how we are going to run from here on because this case has got to end sometime.

. . .

THE COURT: . . . My only question to you is are we operating on an open file policy or this bill of particulars which was filed, responses to them, September 19th. It is your indication that is what we are operating on so I will operate on that throughout the rest of the case. The government better be prepared to have done what they said. I don't have to worry about anymore open file questions.

J.A. at 410-27 (emphases added).

And the district court seems to have carried this understanding -- that the case was not being conducted pursuant to an open file policy -- through the remainder of the proceedings until the time when it entered its final order of dismissal. Said the district court at the October 20, 1995, hearing, for example:

 Now, at the very outset of this matter, and I don't want to get involved with who it might -- but I had suggested way back with members of the U.S. Attorney's Office that I had the highest respect, as much as anybody I know, and we both were of the opinion that we ought to just have what's an open file. That's different to you than me, but we ought to put everything out and let the defendants get whatever they wanted out of it and then let's get on with the case.

 Well, the U.S. Attorney's Office wasn't willing to do that, and I'm sure they had their reasons, and I wasn't going to order them to do such a thing, because, you know, I have never ordered anybody to have an open file. It seems to me

28

if they want to file bills of particulars and fool around with them all for months at a time, but it looks like we're working more and more towards me having to do some sort of thing of that nature.

J.A. at 1935-36 (emphasis added).

Accordingly, the record -- indeed, the court's own statements -- simply does not support the district court's inexplicable conclusion that the parties had proceeded under a full open file policy from the outset of the case.

2.

The first specific example of egregious prosecutorial misconduct cited by the district court was the alleged improper withholding of three FBI 302s prepared by Special Agent Clemens and dated June 14, 1989, June 22, 1989, and July 26, 1989, in which Cobb said that he had made payments to many South Carolina legislators over the years other than defendants Taylor, Blanding, Gordon, Derrick and Long, but refused to characterize those payments as"bribes." 956 F. Supp. at 632-34. The June 14, 1989, FBI 302 states:

> COBB related that in regards to giving money to State Legislators, he routinely gives two or three hundred dollars to some just to keep them friendly toward him. . . . COBB stated that TEE FERGUSON, CHARLES A. HARVIN, III and DONNA MOSS were among those who he would give money. COBB indicated this money was not paid for any specific return benefit other than having someone friendly to him on whom he could call.

The June 22, 1989, FBI 302 states in pertinent part:

> RONALD L. COBB provided a 1989 South Carolina Legislative Manual in which he had checked off all those legislators to whom he had paid money. When asked if these were bribe type payments or campaign contributions COBB replied, "That's a hard question to answer." COBB was then

29

asked if those checked off were persons he had given two, three, or four hundred dollars to for no specific reason other than to maintain favorable contact with COBB. COBB indicated that this was the case, and indicated he would give the money to the legislator and that was it. If the individual then wanted to claim it as a campaign contribution and report it or just stick it in his pocket, that was of no concern to COBB.

Finally, the July 26, 1989, FBI 302 similarly reads:

COBB was asked about the manner in which he would pay legislators several hundred dollars. COBB stated that this was sometimes accomplished with cash, and sometimes by check, either from his business or personal account. COBB advised that sometimes payments were made at official fund raisers and sometimes in a social setting as a token of appreciation for support on something. COBB stated that sometimes a legislator will drop a hint that money is tight and that they could use some cash. COBB added that if it was someone who was friendly toward his interests he would take care of them with a few hundred dollars. COBB emphasized that he did not know and did not care how they handled or reported the money. COBB's sole interest was to gain friends and supporters of his interests.

The district court noted that the language from these three FBI 302s was included in the FBI Columbia Office's 1989 prosecution authorization proposal, which confirmed to the court that the government "was totally familiar with the existence of these 302s," but "yet [the government] did not turn [these 302s] over to the defendants for use at trial." 956 F. Supp. at 634. The district court concluded that these FBI 302s could have been used by the defendants to impeach Cobb's testimony that his payments to them were bribes, and thus to support their defense that the payments were in fact campaign contributions:

Evidence of how Cobb often paid various legislators a few hundred dollars to "keep them friendly" and that it was no concern of his how the recipients handled the monies, was not furnished by the government so as to allow the defen-

30

> dants to attempt to impeach Cobb's testimony that the pay-
> ments he made to these defendants (excluding Long) were
> known by him and by them to be bribes.

956 F. Supp. at 660.

At least defendant Long -- and apparently defendant Derrick, as well**14** -- received both the June 14 and the June 22 FBI 302s prior to trial, a fact not noted by the district court in its opinion. See Br. of Appellees at 40 (acknowledging that Long had access to the June 14 and June 22 FBI 302s). Apparently, the only one of the FBI 302s that these two defendants did not receive was that of July 26. Thus, of the defendants now before the court (Derrick, Long and Blanding), it appears that only defendant Blanding failed to receive all three of these FBI 302s.

It is doubtful whether these three FBI 302s -- which the Depart- ment of Justice's Office of Professional Responsibility concluded were not intentionally withheld by the prosecution but rather were not produced by the FBI to the United States Attorney's Office -- were even "exculpatory," or, if so, "material," and thus producible pursuant to the requirements of Brady v. Maryland , 373 U.S. 83 (1963). The premise of the suggestion that these documents were exculpatory appears to be that campaign contributions cannot, as a matter of law, be the subject of a Hobbs Act prosecution. Therefore, the argument goes, if the defendants could -- by analogy to the payments made by Cobb to other legislators -- show that Cobb's payments to them were campaign contributions, their Hobbs Act prosecutions could not stand.

However, as the Supreme Court has held, campaign contributions may be the subject of a Hobbs Act violation, no less than any other payments,

_____

**14** The government has in its files "a letter to Derrick's counsel trans- mitting this document [the June 22, 1989 FBI-302] before his trial," and it moved in the district court to have this letter included in the record before this court. Reply Br. of United States at 20 n.14. The district court has now granted that motion and, accordingly, we grant the consent motion of the United States to supplement the joint appendix.

31

> if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

McCormick, 500 U.S. at 273; see also Evans, 504 U.S. at 268 ("We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."); United States v. Montoya, 945 F.2d 1068, 1074 n.2 (9th Cir. 1991) (noting in prosecution for receipt of illegal honoraria, not campaign contributions, that "[t]he critical question is whether the payments were induced and whether a quid pro quo exists, not how an official labels the payments in his defense to a charge that the payments were extorted"). Because the mere characterization of a payment as a campaign contribution does not insulate that payment from Hobbs Act prosecution, it is difficult to discern even how the FBI 302s, reciting the frequency with which Cobb made payments to legislators and Cobb's refusal to characterize the payments he made to other legislators as either campaign contributions or bribes, could be considered exculpatory. It is less clear still how these documents could be considered "material," given that they related to individuals other than the defendants, and the payments received by the defendants as quid pro quo in return for their official votes were recorded on both videotape and audiotape.

In any event, the substance of Cobb's testimony was well known to the defendants. Thus, the defendants were free to question Cobb as to which individual legislators he made payments and the circumstances under which the payments were made.

First, each of the defendants was provided a copy of Cobb's grand jury testimony, in which he both stated that, over the years, he had routinely made $200-$300 payments to a number of legislators, and declined to characterize the payments as either campaign contributions or bribes. Cobb testified before the grand jury on July 17, 1990, for example, that he had often made payments to legislators:

32

> [O]ver the years, its been very customary and not unusual
> at all to give a guy a couple of hundred bucks, $300 bucks
> along, because he has helped you. And sometimes he'll
> come and say, look man, I'm going out. I want to do this.
> Can you help me out a little bit. So that's not unusual at all.

J.A. at 2400. And during the same grand jury appearance, in response to a question from a grand juror, he likewise declined to characterize these payments as either campaign contributions or bribes:

> Q: Is this -- do you consider that when you give [the cash]
> to [the legislators], do you consider that a political contribu-
> tion or a bribe when you give it to them? In other words,
> when you state your case or whatever and hand them
> money, do you say, this is a political contribution or a cam-
> paign contribution or is this something for you?

> A: In a situation like that, it's kind of understood if I pull
> cash out of my pocket and give it to, Mr. Legislator, and you
> put it in you pocket, then I don't know nothing and you
> don't know nothing.

Id. at 2401.

In addition to receiving Cobb's grand jury testimony, the defendants also received a copy of a May 1, 1989, FBI 302 in which Cobb was reported to have said that he "ha[d] made many contributions in the $300 to $500 range to elected officials over the years," and that "most of these contributions would be legal in the strict sense of the word, but his reason for making them was for favorable consideration of his lobbying efforts." J.A. at 2177.[15] Thus, it is plain that the defendants were fully aware of the very same information included within

_____

[15] Additionally, at the February 28, 1991, evidentiary hearing on the motions to dismiss indictments -- which was held during the Blanding/Gordon trial -- Special Agent Clemens testified that he had prepared from the legislative manual an FBI 302 listing the names of all of the legislators to whom Cobb remembered making payments over the years. J.A. at 835-36. Blanding and Gordon were therefore clearly aware of that information prior to the conclusion of their trial.

the FBI 302s from a number of other sources. Indeed, that Cobb had frequently made payments to other legislators in the past appears to have been a fact well known to all from the inception of the prosecution.

The Supreme Court has said that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense." United States v. Agurs, 427 U.S. 97, 1109-110 (1976); rather, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 678 (1985). From the foregoing, it is apparent that, in no sense at all, can it be said that the proceeding below would have been different had the defendants been provided the three FBI 302s discussed.

Accordingly, because Brady did not require production of these three FBI 302s, the prosecution's failure to produce the documents to defendants was not error -- much less intentional misconduct.

3.

As another example of egregious prosecutorial misconduct, the district court cited to the government's failure to produce the July 18, 1990, FBI 302s of defendant-legislators James Faber, Frank Earl McBride, and Ennis Maurice Fant, in which each legislator characterized as "campaign contributions" the payments he received from Cobb in connection with the parimutuel betting legislation. 956 F. Supp. at 634. In a single sentence, the district court stated, without substantive explanation, that "[e]ven had the defendants not been able to utilize these 302s at trial as statements of unavailable witnesses . . . it is the opinion of the court that these 302s should have been provided as relevant discovery material." Id.

As with the FBI 302s of Cobb, in which Cobb admitted making payments to many different South Carolina legislators but refused to characterize the payments as either campaign contributions or bribes, it is difficult as a threshold matter even to discern the relevancy of the Faber, McBride, and Fant 302s to defendants' Hobbs Act prosecu-

34

tions. That these three legislators regarded the payments they received as campaign contributions, rather than bribes, would appear to be neither exculpatory nor material for the same reasons that Cobb's FBI 302s would not have been exculpatory or material. The exculpatory and material character of these FBI 302s is diminished even further, if not eliminated altogether, by the fact that each of the three legislators were either unindicted targets or had actually been indicted and pled guilty at the times of the defendants' trials; thus, their testimony that they regarded the payments they received, not as bribes, but as campaign contributions, could hardly be considered exculpatory. Moreover, as the district court recognized, the statements by the legislators in these FBI 302s likely would not even have been admissible at trial because they are hearsay.

4.

The district court additionally admonished the government for not producing to the defense certain video and audio recorded conversations dated January 16, 1990, and April 5, 1990, between Cobb and state legislator Robert Kohn, whom Cobb paid to recruit other legislators to support the parimutuel betting legislation. During the January 16 conversation, the following exchange took place between Kohn and Cobb:

> COBB: And if we make a showin' and you're gonna see what they do, I mean, they, and they're willin' to do, they'll do whatever I ask 'em to do.

> KOHN: See, I, I think that they, we got the thing out of committee with no one doing anything.

> COBB: Yeah, yeah.

> KOHN: No money, and you know, just, just doin' for the issue. Now the Baptist Courier sent their note out last week, I mean, and its gonna be, they're, they're gonna follow it. So people that are under the control of Baptist Courier are gonna run.

35

COBB: How many people do you think that we can, that we can get the one-on-one situation with and where we give them the right motivation, like I say, we gotta, you know, we gotta do a good showin'.

KOHN: I'm sure we can, no, we, no I think we can do well on that.

. . .

KOHN: Let me start, I'll start first thing in the, well hell, I might even start tonight.

COBB: Right.

KOHN: (Unintelligible)

COBB: You know how to, I mean you know how to work it and cover us, I mean, we don't want come [sic] over there and say well, here, they're gonna buy the damn thing.

KOHN: No I understand.

J.A. at 2337-2340. And during the April 5 conversation, Kohn tells Cobb:

I'm not trying to hold back, I mean I realize (unintelligible) I ain't trying to play that game. (Unintelligible) I've been asked for gold coins. If it doesn't look like money should be brought up, I don't do it to hold back money, I just don't think it's good to bring it up (unintelligible). I use (unintelligible) some of them I just casual comment about a contribution to their campaign 'cause see if you have to do that I can write a check and tell them I think their [sic] a good spirited citizen (unintelligible).

956 F. Supp. at 635. Again without any explanation, and in a single conclusory sentence, the district court recited merely that,

36

> [t]hese tapes, as well as the numerous other audio and video tapes furnished to the defendants on November 29, 1993, certainly must be viewed as exculpatory evidence which could have been used to further the defense put forth by these defendants that they considered the monies they received from Cobb to be campaign contributions.

Id. at 636. Presumably the district court concluded that, as legislator Taylor had argued, the January 16 tape established that the payments he received were not a quid pro quo for his support of the parimutuel betting legislation because this bill had been voted out of his committees prior even to institution of the sting operation. See id. at 635. It cannot be determined what underlay the district court's conclusion that the April 5 tape of the telephone conversation between Kohn and Cobb should have been produced, except that Taylor's name appeared in the FBI 302 that reproduced the transcript of the telephone conversation and it "[was] impossible for the court to ascertain whether [Taylor] was present at the time the [quoted] statement was made to Kohn." Id. at 635. Because Taylor's name"[did] appear in the cover FD-302, yet he was not furnished this tape or the FD-302 and transcription prior to his trial," the district court reasoned that the tape was wrongfully withheld.**16**

With respect to the January 16 tape, it appears that the district court was simply incorrect that it had not been produced by the government. In fact, as Taylor's counsel Joel Collins candidly acknowledged in open court, J.A. at 420, the tape had been produced for inspection pursuant to the district court's order, but he simply had not had an opportunity to view it.

Apart from the fact that defense counsel was provided access to the January 16 tape, it is hard to imagine, as with the FBI 302s of Cobb and of the three co-conspirator legislators, how this tape is exculpatory or material. Even assuming that Taylor supported the parimutuel

_____

**16** The district court explained that it was reasoning primarily from the submissions made by Taylor, Blanding, and Gordon, and that "some, although by no means all, of the previously withheld evidence was available to [Derrick] and defendant Long for their trials." 956 F. Supp. at 636 (footnote omitted).

betting legislation in committee the previous spring, see J.A. at 2338 (statement of Kohn that "nobody's really done anything since the committee last spring voted on the thing"), it was still possible that he violated the Hobbs Act by receiving money in return for his continued support of the legislation on the floor of the Statehouse. The receipt of money, even for official action that would have been taken anyway, violates the Hobbs Act, as we held in United States v. Paschall, 772 F.2d 68 (4th Cir. 1985), cert . denied, 475 U.S. 119 (1986).

It is unclear whether the April 6 tape, in particular, was produced to the defense, but, in any event, it was neither discoverable nor ordered produced by the district court. Not only is the conversation recorded on this tape not (at least not evidently) exculpatory, describing only the care with which Kohn decided whether or not to raise with legislators the question of money in return for their votes, but the record establishes clearly that, at the October 11, 1990, evidentiary hearing conducted by the court, the government offered to provide this and all other tapes to the court for its review and determination of whether exculpatory information was included, an offer which Taylor's counsel rejected. See J.A. at 353 (statement of Mr. DuTremble that "I am willing to provide the court with all tapes. And the government's position is let the court make an independent determination, that is, as to what is or is not exculpatory"); id. at 343 (statement by Joel Collins that "I would like the record to show that we would like to withdraw our consent to the in camera review of potentially exculpatory evidence."). Furthermore, the order entered by the district court at the conclusion of its full evidentiary hearing on October 11, 1990, during which this and the other tapes were discussed, required only that the government produce for defense inspection "videotapes" in the government's possession, and thus did not cover the April 6 tape, which was an audiotape. See J.A. at 395-97 (district court order).

5.

The district court also relied in part for its dismissal of the defendants' indictments on the nonproduction of copies of nine checks written by Cobb to various South Carolina legislators in amounts ranging from $100-$650. The district court noted that the defendants

38

argued that copies of these checks would have "corroborate[d] the information . . . from the FD-302s of June 14, 1989, June 22, 1989, and July 26, 1989, and that this information would have served to refute Cobb's testimony at the trials that the payments he made to these defendants were definitely known by them to be bribes." 956 F. Supp. at 634 (citation omitted).

Again, the district court offered no analysis or reasoning in support of its conclusion that these documents should have been produced. The court simply repeated that the defendants argued that copies of these checks would have aided them in their defense.

We are unable to divine how these checks written by Cobb to legislators other than the defendants would be exculpatory or material. "Corroboration" of the fact that Cobb had made many payments over the years to other legislators was unnecessary, as there was ample evidence of this fact and the fact was not disputed; nor is it apparent how these checks would have served to refute any suggestion by Cobb that his payments to the defendants were bribes. Even the district court did not initially order production of these checks when, in 1995, they, and other materials, were provided to the court for in camera inspection. When, upon subsequent motion, the court concluded that these documents "were not properly identified by the court in its original in camera review," J.A. at 1112, 1443 n.1 (district court order of Sept. 7, 1995), and should be produced, id. at 1444, 1455, the district court stated only that "[a]t this point, . . . the court simply states that it is of the opinion that these documents should now be turned over to the defendants." Id. at 1444.

6.

The district court rested its dismissal of defendants' indictments also upon the government's failure to produce all of its files bearing on Cobb's drug use from 1988, forward:

> The full scope of Cobb's drug usage was often sought by the defendants in their quest for discovery materials which might impeach Cobb's testimony at defendants' trials. On November 29, 1993, the defendants received a minimum of six FBI documents which revealed that Cobb had been

39

under investigation by the FBI for drug violations since early 1988, and that he had used cocaine on at least two other previously unknown occasions in May of 1989, after he went to work for the FBI. Several of these documents indicate that Cobb was reputed to be a cocaine "trafficker" and implicated others, such as Greer and Kohn.

In contrast to representations by the government on the record in open court that they had given the defendants each and every tape they had, some 50 audiotapes and 118 FD-302s, which contain evidence bearing on Cobb's drug usage and trafficking, were received by defendants in February of 1995.

956 F. Supp. at 650 (district court op.; citations omitted). As a consequence of the nondisclosure of these documents, the district court concluded,

[a]ll of the defendants . . . were unable to impeach Cobb's testimony and confront him with the fact that he had been involved in drugs on more occasions and over a longer period of time than disclosed, and that his involvement in drugs was so deep that he had earned the reputation of a "trafficker."

Id. at 651.

These documents were, as the district court noted, not produced to the defendants prior to their trials. Additionally, it appears that the defense also did not receive, prior to trial, the information relating to Cobb's drug use in May of 1989. However, each of the defendants did receive copies of Cobb's grand jury testimony in which he detailed his drug purchases from and for South Carolina legislators and his personal use of cocaine during 1987-88, including his personal use of cocaine with the individual legislators. See J.A. at 2402-16 (grand jury testimony). Before the grand jury, Cobb testified essentially that he had gotten together with a group of individuals every week or so during 1987-88 to do drugs. See, e.g. , J.A. at 2414; see also id. at 2407 (statement by Cobb that "you would have a little get together with people who use cocaine. And certainly I would use it, and I did

40

it, too."). Cobb also testified before the grand jury that he had actually used cocaine in 1989, and as late as the latter part of 1989. J.A. at 2414-16.

As the district court noted, in addition to Cobb's substantial grand jury testimony concerning his cocaine purchases and use, "Cobb's drug usage on the dates of October 13, October 18 and November 18, 1989, was disclosed at the [defendants'] trials," Cobb's "indictment for possession of cocaine on February 2, 1990, and January 11, 1991, was returned a few days prior to the Blanding/Gordon trial," and Cobb "pled guilty to these incidents prior to the Derrick and Long trials." 956 F. Supp. at 649-50. Moreover, as the Department of Justice explains, each defendant was also apprised of Cobb's "drug-related arrest in 1989, including the fact that it occurred while Cobb was attempting to purchase a kilogram of cocaine." Br. for the United States at 65. Additionally, Cobb testified during the Blanding and Gordon trial that he had used or provided cocaine to South Carolina legislators 50-60 times.

Against the backdrop of the considerable amount of evidence known by or provided to the defendants about Cobb's personal cocaine use and distribution over the years, including use in 1989 after his employment with the government began, it is impossible to conclude that the investigatory documents generated in 1988, prior even to the initiation of the Lost Trust investigation, and the documents revealing only a handful of previously unknown personal uses in May of 1989 and in 1990 and 1991, were anything but cumulative and immaterial.

7.

The district court also concluded that the government had wrongfully failed to produce to defendant Taylor a December 6, 1989, videotape of legislator Kohn selling Cobb $500 worth of cocaine and using cocaine. The district court said that it had referenced this issue "to show the cumulative effect on the defense of potentially impeachable material not being fully or timely disclosed." 956 F. Supp. at 651.

Again, we are at a loss to understand the reason for the district court's inclusion of this incident as an example of "egregious pro-

41

secutorial misconduct," because the district court itself, in its own opinion, recognized that the prosecution had apprised Taylor's counsel of the tape by letter before trial and that, as with the other video tapes, see discussion supra, Taylor's counsel, simply had not had time to view the tape:

> Taylor concedes that he received a letter from the government very shortly before trial telling him that the government had evidence of Kohn giving cocaine to Cobb. He argues that he was deeply involved in preparing for trial; and that since this is all that he was told, he did not take the time to pursue it.

956 F. Supp. at 651. The district court even noted that "[a]lthough it is the government's responsibility to disclose evidence to the defendants in a timely and honest manner, it is also the responsibility of the defense to review that evidence when it is disclosed." Id. In any event, it is doubtful whether the tape would have been admissible at trial, given that Kohn testified at trial to his extensive drug and alcohol use. Id. (district court noting that "Kohn's involvement in the extensive use of cocaine and alcohol was admitted by him during the trials").

B.

Through innuendo only, and without any explanation as to any conclusions it drew, the district court also suggested in its order that FBI Special Agent Clemens and Ron Cobb perjured themselves concerning an October 18, 1990, early-morning visit by Clemens and Cobb to the home of Steven H. Smith, a close friend of Senator Lindsay, and a telephone call that morning to Lindsay by Clemens and Cobb, during which the issue of Cobb's payment of $10,000 to Senator Magnum and Senator Lindsay in connection with the Oil Jobber's Bill was discussed. (All of the defendants knew of this visit and call before their trials; accordingly, the issue is not disclosure, but, rather, possible wrongdoing by the prosecution and the FBI agent involved.) The district court intimated that Clemens lied when he testified that the purpose of the telephone call was to inform Lindsay that Cobb was going to testify as to the $10,000 payment the following day at the Luther Taylor trial, and that Cobb similarly lied (at least initially) that this was the purpose of the telephone call.

42

Clemens testified at the district court's February 28, 1991, evidentiary hearing that the purpose of the visit and the telephone call was to enable Cobb to tell Lindsay of Cobb's expected testimony about the payment the next day so that Lindsay, Cobb's close friend, would not first learn of the testimony through the media. J.A. at 823-25. Clemens testified that when Cobb became too emotional to carry on the telephone call with Senator Lindsay, he (Clemens) informed Lindsay of Cobb's impending testimony as to the Lindsay payment. J.A. at 839-40.

Cobb likewise testified that the purpose of the telephone call was so that he could tell Lindsay that he was going to testify about the payment before Lindsay learned of the testimony from the media. J.A. at 812-14 (testimony of Cobb). Cobb denied that the purpose of the telephone call was to determine, with Lindsay, how to characterize the $10,000 payment. J.A. at 814-15 (testimony of Cobb).

Following this testimony by both Clemens and Cobb in February of 1991, the district court denied Blanding's and Gordon's motion to dismiss their indictments on the ground that Clemens and Cobb had perjured themselves and that the purpose of the telephone call was to coordinate witness testimony.

In April of 1991, after the Blanding and Gordon trial, when Taylor was seeking bail pending appeal, Smith also testified to the October 18 events. He detailed his understanding that Cobb wanted to characterize the $10,000 payment as a legal fee, but that Agent Clemens insisted that he could not do so because the payment was not for legal services. J.A. at 911-12, 917 (testimony of Smith).

This was the state of the record until four and a half years later, in October of 1995, when Smith testified to the events again. At this hearing, without explaining its omission from his testimony years earlier, Smith testified repeatedly that Cobb had been authorized by the United States Attorney to characterize the $10,000 payment as an attorney's fee. J.A. at 1563-64, 1569, 1582-83 (testimony of Smith). He also testified repeatedly that Cobb was refusing to characterize the payment truthfully absent permission to do so from Lindsay. J.A. at 1565-66, 1569, 1583 (testimony of Smith). Cobb, too, in his testimony during the same hearing, suggested that someone in the United

43

States Attorney's Office had told him that he could characterize the payment as a legal fee. J.A. at 1617-19, 1637-41.

Based upon the latter testimony of Smith, which the district court viewed as consistent with Smith's February 1991 testimony, and of Cobb, the district court stated that Smith's testimony:

> indicates that SA Clemens, himself was not entirely truthful in his testimony at the hearing on February 27, 1991, when he described the purpose of the visit [of October 18] as one only to give information to Lindsay. Further, it indicates that Cobb also was not truthful in his testimony at the February 1991 hearing.

956 F. Supp. at 648. The court characterized as "shocking" both the involvement of Clemens in the early morning visit and the October 1995 testimony by Cobb that the United States Attorney had authorized him to call the $10,000 payment an "attorney's fee." Id.

As to Cobb's 1995 testimony about the payment characterization, the district court expressly declined to "make a specific finding as to Cobb's truthfulness," and therefore a finding as to whether United States Attorney Daniel authorized Cobb to term the payment an "attorney's fee." In fact, the district court said that it was "loath to give credence to Cobb's testimony over the statements of these prosecutors." Id. at 649. And, of course, not only did Smith repeatedly testify that Clemens had insisted that Cobb tell the truth about the payment, but Cobb never testified in any proceeding that the payment was an "attorney's fee." Therefore, there is no basis for concluding that the United States Attorney engaged in any wrongdoing in connection with Cobb's characterization of the $10,000 payment to Senator Lindsay.

44

**Volume 2 of 2**

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

PAUL WAYNE DERRICK,
Defendant-Appellee.

No. 97-4230

DALE L. DUTREMBLE; E. BART
DANIEL; RICHARD GREER,
Amici Curiae,

and

CHARLESTON POST AND COURIER,
Movant.

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

JEFFERSON MARION LONG, JR., a/k/a
Bud,

No. 97-4231

Defendant-Appellee.

DALE L. DUTREMBLE; E. BART
DANIEL; RICHARD GREER; ALVA
TAYLOR BROWN, Personal
Representative of the Estate of
LUTHER LANGFORD TAYLOR;

NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS,
<u>Amici Curiae,</u>
and

CHARLESTON POST AND COURIER,
<u>Movant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellant,</u>

v.

LARRY BLANDING,
<u>Defendant-Appellee.</u>

DALE L. DUTREMBLE; E. BART
DANIEL; RICHARD GREER; ESTATE OF
BENJAMIN J. GORDON, JR., a/k/a B. J.

No. 97-4232

Gordon; ALVA TAYLOR BROWN,
Personal Representative of the
Estate of LUTHER LANGFORD TAYLOR;
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS,
<u>Amici Curiae,</u>

and

CHARLESTON POST AND COURIER,
<u>Movant.</u>

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Falcon B. Hawkins, Chief District Judge.
(CR-91-91-FBH, CR-91-384-FBH, CR-90-434-FBH)

Argued: May 7, 1998

Decided: November 23, 1998

46

Before WIDENER, NIEMEYER, and LUTTIG, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Luttig wrote the opinion, in which Judges Widener and Niemeyer joined. Judge Widener wrote a separate concurring opinion.

_____

**COUNSEL**

**ARGUED:** Elizabeth Dorsey Collery, Appellate Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Dale L. DuTremble, Charleston, South Carolina; Gedney Main Howe, III, Charleston, South Carolina, for Amici Curiae DuTremble, Daniel and Greer. Joel Wyman Collins, Jr., COLLINS & LACY, P.C., Columbia, South Carolina; Jack Bruce Swerling, Columbia, South Carolina, for Appellees. Marvin David Miller, Alexandria, Virginia; Lionel S. Lofton, Charleston, South Carolina; Joel W. Collins, Jr., COLLINS & LACY, P.C., Columbia, South Carolina, for Amici Curiae Association, Gordon, and Estate of Taylor. **ON BRIEF:** John C. Keeney, Acting Assistant Attorney General, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. James E. Bell, III, BELL & MOORE, Sumter, South Carolina, for Appellee Blanding. Lisa B. Kemler, ZWERLING & KEMLER, Alexandria, Virginia, for Amicus Curiae Association.

_____

As to Clemens' participation in the early morning visit to Smith's house and the telephone call to Senator Lindsay, the government admits that such was "unorthodox and, in retrospect, ill-advised." Br. of United States at 96. But there is nothing to suggest that Clemens engaged in wrongdoing. Indeed, to the contrary, Smith, upon whose testimony the district court relied for the suggestion of wrongdoing, repeatedly testified that Clemens and Cobb had been arguing over whether Cobb would tell the truth -- as Clemens insisted -- or characterize the payment as a legal fee, and that Clemens, throughout the

evening, had insisted that Cobb tell the full truth. J.A. at 912, 1583, 1588. Smith even said the following of Clemens:

> Q: Did you see Mike Clemens in any way at all that night act in an inappropriate way?
>
> A: No. I saw Mr. Clemens trying to perform in the most appropriate way.
>
> Q: And I believe that your opinion of Mike Clemens' actions on that night were all above -- everything he was doing was aboveboard?
>
> A: My opinion of Mike Clemens that night and on every occasion I have ever met him are very high. He was trying -- he was trying to set -- and he was trying to make things the truth and right in the day's following testimony.

J.A. at 1589.

The district court did not even say what purpose Cobb's telephone call to Lindsay served other than the one identified by Cobb and Clemens. And there is clearly insufficient evidence from which to infer a purpose for Cobb's telephone call to Lindsay other than that to which Cobb and Clemens initially testified. Both Cobb and Clemens testified that the purpose was not to obtain permission from Lindsay to characterize the payment in a particular way, and, of course, Smith was not a party to the telephone call, but only present in the room when the call occurred. See, e.g., J.A. at 1569 (Smith noting that when Cobb was on the telephone with Lindsay "I was then talking to Agent Clemens over on the other side, so it was kind of out one ear and the other . . . ."). And obviously there is no basis for concluding that Clemens' testimony was necessarily false based upon Smith's 1995 testimony as to the purpose of the telephone call, because that testimony was based (if not upon the partial conversations he heard contemporaneously) upon Cobb's statements to Smith, not on the call itself. As the government notes, "if Smith's testimony was based on his conversation with Cobb, it does not show that Clemens testified falsely when he stated his own understanding regarding the `purpose' of the call." Br. of United States at 97.

48

The only other possible basis for concluding that there was more to the telephone call than Clemens and Cobb testified is the district court's observation that "Lindsay was no stranger to publicity, and a notice to him that his name might appear in the media as a result of Cobb's testimony would certainly not warrant a telephone call to a dying man in the middle of the night." 956 F. Supp. at 648. However, not only is this the rawest of speculation, but we disagree with the district court that a call for the purpose stated by Clemens and Cobb would be out of the ordinary, given the close friendship between Cobb and Lindsay, the imminence of the public testimony, and the conceded condition of Senator Lindsay at the time.

C.

The district court inexplicably devoted a considerable portion of its order dismissing the indictments to its perception that the government had inadequately investigated allegations of bribery with respect to the State's capital gains legislation and had suborned grand jury perjury by Richard Greer, the former Chairman of the South Carolina Development Board, about the capital gains matter. These comments by the district court about the capital gains investigation were entirely gratuitous, because that investigation was wholly unrelated to the Lost Trust investigation that led to the prosecution of the defendants in this case. Moreover, the court's conclusions as to both the adequacy of the Executive Branch's investigation into the capital gains bribery allegations and the alleged perjury were wholly without support in the record.

Upon receipt of information concerning corruption surrounding the State's capital gains deduction rollback, see J.A. at 2183 (5/1/89 FBI 302 recording Cobb's statement regarding "payoff" to Senator Jack Rogers through lobbyist Ken Kinard), J.A. at 2198 (9/25/89 FBI 302 stating that "Cobb advised that he had to pay off both JACK LINDSAY on the Senate side and JACK ROGERS on the House side"), J.A. at 2485 (9/11/90 FBI 302 reporting lobbyist Randy Lee's statement that he was "privy" to these efforts), the government began an investigation, headed by Agent Michael Morehart, a white collar crime specialist, into the allegations of bribery with respect to the capital gains legislation.[17] Greer and Senators Lindsay and Rogers were

_____

[17] At the same time that the State was attempting to rollback the deduction so as not to deprive taxpayers of a deduction for capital gains real-

49

the subjects of the investigation. Greer subsequently cooperated with the government, eventually testifying, on May 23, 1991, before a federal grand jury investigating the capital gains matter.

The district court volunteered the following as to the federal government's investigation of Greer in connection with the capital gains matter:

> The government's actions as outlined in this order suggest a total avoidance of pursuing information that might have proved adverse to Greer. . . . The government's failure to fully investigate Greer might be excused as falling within the province of the government's prosecutorial discretion if his alleged involvement was isolated. The fact that it surfaced in an investigation resulting in the convictions of these defendants and may have had an impact on the fairness of their trials puts the government's handling of Greer's involvement in an entirely different light.

956 F. Supp. at 660.

As an initial matter, the district court was without authority to comment upon the government's capital gains investigation. The caselaw is legend from the Supreme Court and the courts of appeals that the investigatory and prosecutorial function rests exclusively with the Executive. See, e.g., Wayte v. United States, 470 U.S. 598, 607 (1985) ("Such factors as the strength of the case, the prosecution's general

_____

ized in the first half of 1987, the State was also considering whether to lower South Carolina's capital gains tax, which was one of the highest in the country. In contrast to the "rollback" legislation discussed above, this prospective reduction was a priority of then-Governor Campbell and, as a consequence, of Greer, as chairman of the South Carolina Development Board. As discussed below, the only allegations of capital gains corruption were in connection with the retroactive "rollback" legislation -- not with the prospective legislation -- and there is no record evidence to support the district court's suggestion that either Greer or Governor Campbell was involved in that corruption or that the matter was inadequately investigated.

50

deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."); Heckler v. Cheney , 470 U.S. 821, 832 (1985) (noting that a prosecutor's decision not to indict "has long been regarded as the special province of the executive Branch, inasmuch as it is the Executive who is charged by the Constitution to`take Care that the Laws be faithfully executed.'"); United States v. Giannattasio, 979 F.2d 98, 100 (7th Cir. 1992) ("[a] judge in our system does not have the authority to tell prosecutors which crimes to prosecute or when to prosecute them"). As the Ninth Circuit has said,

> [i]t would raise serious separation of powers questions -- as well as a host of virtually insurmountable practical problems -- for the district court to inquire into and supervise the inner workings of the United States Attorney's Office.

United States v. Redondo-Lemos, 955 F.2d 1296, 1299 (9th Cir. 1992). But in this instance, judicial intrusion into the investigatory function of the Executive was even less defensible because the capital gains matter had absolutely nothing whatsoever to do with the Lost Trust investigations and trials that were pending before the district court. And certainly Richard Greer had nothing to do with the Lost Trust investigation or trials. The capital gains matter was a separate investigation of events that occurred two years earlier, which was supervised by different personnel than those assigned to the Lost Trust investigation. The district court's comments, thus, were gratuitous to the cases before it, and its unsupported suggestion that the government's failure to adequately investigate the capital gains matter "may have had an impact on the fairness of [defendants'] trials," 956 F. Supp. at 660, was without basis.

Even so, the district court was clearly in error that Greer had not been investigated. Although the district court noted none of the following, authority was sought from the outset of the federal government's investigation into the capital gains matter to surreptitiously record Greer's conversations with cooperating witnesses. J.A. at 2505. Agent Morehart interviewed numerous individuals, including Gary Turner, Executive Director of the South Carolina Tax Commission, J.A. at 1691-92; Gail Kinard, Senator Rogers' secretary, J.A. at

51

1692; Senator Passailaigue, J.A. at 1693; Hunter Howard, Chairman of the South Carolina Tax Commission, J.A. at 1695; Senator John Mathews; Senator James Waddell, Jr.; Thomas Roe; Walter Brashier; and Otis Rawl, Director of Tax Research for the South Carolina Tax Commission, and Morehart received information from more persons still. Morehart analyzed bank records of Cobb and traced the money that was paid to Ken Kinard & Associates. J.A. at 1701-02.**18** A number of persons appeared before the federal grand jury, see J.A. at 2525-2641, including Morehart, J.A. at 1709, 2632-41, and, of course, Greer himself was interviewed several times and appeared before the grand jury, J.A. at 2583-2604. At the end of his investigation, and unmentioned by the district court, Morehart testified as follows:

> Q: Did you want to do more with the investigation?
>
> A: No, sir. I think I did a pretty comprehensive investigation.
>
> Q: Do you remember that there were any leads you wanted to pursue that you couldn't?
>
> A: No, sir, none.
>
> Q: Were there any resources you wanted that you couldn't get?
>
> A: I was adequately supplied.

_____

**18** A number of witnesses testified that Greer never took money in connection with the capital gains legislation, and the district court noted that the government strenuously asserted as much. 956 F. Supp. at 644. The district court nonetheless stated that "[t]here is nothing in the record to show that the government's `active pursuit' of Greer included a review of Greer's financial records." Id. However, as the United States points out, "no one ever suggested that Greer profited personally from the capital gains matter . . . [and thus] it is unclear what basis the government would have had to undertake such a review." Br. of United States at 105 n.53; see also J.A. at 2111 (statement of defense witness Rhonda Collins that, to her knowledge, Greer did not receive any money in connection with the capital gains matter).

> Q: Did anyone ever ask you to keep the capital gains investigation away from the knowledge of other people?

> A: No, sir.

J.A. at 1778. And, as a result of the investigation, Senator Rogers pled guilty, and the government planned, until his death, to prosecute Senator Lindsay. See, e.g., Reply Br. of Prosecutors Amici at 12 (noting that "Lindsay's attorney had a plea agreement in hand at the time of Lindsay's death.").

Clearly, the district court overstepped its bounds, and in so doing erred, when it stated conclusorily that Greer had not been adequately investigated by the government.

Equally without record support is the district court's related assertion, without any citation whatsoever, that "the record is replete with implications that Greer was heavily involved in payoffs related to the capital gains tax bill," 956 F. Supp. at 660. In making this unsupported allegation, the district court appears simply to have accepted as true the initial allegations made by Randy Lee that prompted the investigation into Greer, despite the fact that the investigation that followed disclosed nothing to suggest that Greer was, in fact, involved in any alleged payoffs. Indeed, Lee -- whose initial allegations against Greer are the only suggestion in the record that Greer might have engaged in wrongdoing in connection with the capital gains matter -- subsequently testified under oath post-trial that he was unaware of any wrongdoing by Greer regarding the capital gains legislation. As Lee himself explained, Lee knew only what Cobb had told him, which was that he (Cobb) had paid money to Rogers and Lindsay and that no one else, other than Ken Kinard, was involved. J.A. at 1878-79 (testimony of Lee).

Moreover, this later testimony by Lee also makes clear that the district court's concomitant intimation that Governor Campbell was involved in wrongdoing in connection with the capital gains legislation, see 956 F. Supp. at 640, 642, is likewise lacking in record support. As was the case with Greer, Lee was the only person whose testimony might even arguably be read as implicating Governor Campbell in the alleged capital gains bribery. And the only allega-

53

tions of capital gains corruption of which Lee was aware were Cobb's allegations of payments to <u>Lindsay</u> and <u>Rogers</u> in connection with the <u>retroactive</u> legislation. <u>See, e.g.,</u> J.A. at 2183 (Cobb's description of his payments to Lindsay and Rogers in connection with the "capital gains tax credit," <u>i.e.,</u> the retroactive"rollback" bill). Cobb never suggested any wrongdoing by Governor Campbell. And Lee explained in his subsequent testimony that he had mistakenly implicated Campbell in the capital gains wrongdoing because, at the time when he had originally spoken with the FBI, he had not been aware that there were two different bills in the legislature concerning the capital gains matter -- the prospective legislation, which was a priority for the Campbell administration, and the retroactive legislation, which was not. J.A. at 1878-81 (testimony of Lee).**19**

D.

No more supportable were the district court's suggestions that Richard Greer perjured himself before the grand jury and that the prosecutors suborned that perjury. Indeed, a simple reading of the grand jury testimony itself reveals that it is not even arguable that Greer was intentionally misleading the grand jurors.

As the district court noted, 956 F. Supp. at 643-44, Greer testified before the grand jury on May 23, 1991. During that testimony the following exchange occurred between Assistant United States Attorney Barton and Greer:

_____

**19** Likewise unsupported by the record is the district court's suggestion that Senator William Richard Lee's December 3, 1990, statement, through counsel, that he was present at a meeting in the spring or summer of 1988 with Governor Campbell and his staff where he was told that the capital gains legislation was "the most important legislation to the governor's office for this legislative year[and] [i]f anybody raises a question about it, you are to sweep it under the rug," 956 F. Supp. at 644, implicated Governor Campbell and Greer in wrongdoing. Senator Lee testified under oath post-trial that he did not know of or have any information as to any illegality by Governor Campbell with respect to the capital gains legislation. J.A. at 1666. In fact, Senator Lee testified that he never "had any information as to any illegal conduct by anybody regarding the capital gains bill." J.A. at 1666.

Q: Were you aware of any monies paid to any legislators in effort (sic) to influence their vote in connection with the capital gains rollback bill?

A: No.

Q: How about in connection with the Governor's change, the bill that was his priority?

A: Absolutely not.

J.A. at 2596-97. The district court seemed to believe that this testimony was perjurious because,

> [i]t is obvious from the government's argument for a downward departure for Greer that Greer had knowledge as early as December of 1990 that payoffs had been made by Cobb to Lindsay and Rogers. USA Daniel, who was present at the Christmas 1990 meeting, and who was, or should have been, privy to information given at other debriefings of Greer, was also present when AUSA Barton questioned Greer before the Grand Jury. Daniel did nothing to correct Greer's testimony that he was not aware of any illegal payoffs to legislators.

956 F. Supp. at 643; see also id. at 660 ("[Greer's] testimony before the Grand Jury would have to be perjured if the arguments advanced by the government at Greer's sentencing are true."); id. ("The court further finds that the government did, in fact, allow testimony from . . . Greer that it knew to be untrue to stand uncorrected.").

Again, as with the district court's remarks concerning the government's investigation of the unrelated capital gains matter, we are at a loss even to understand why the district court was addressing itself to Greer's testimony before the grand jury investigating the capital gains matter. That matter, and Greer's testimony in connection with that matter, were peculiarly irrelevant to the Lost Trust matter which was pending before the district court.

55

In any event, it is painfully clear that the district court simply, and clearly, erred in its charge of perjury against Greer, and therefore also in its related charge of subornation of perjury by prosecutors Daniel and Barton. Greer was not asked by Barton "Are you aware of any monies paid to any legislators in effort (sic) to influence their vote in connection with the capital gains rollback bill?" Rather, he was asked "Were you aware of any monies paid to any legislators . . . ." The question, in context, if not also by its terms, elicited a response from Greer as to whether he knew of any such payments at or about the time they were made in 1988, not whether, as of the time of his testimony in 1991, he knew of such payments. This is not a "play with semantics," as the district court characterized it, id. at 643-44; these are different questions -- and self-evidently so.

By the time of his grand jury testimony, Greer obviously knew of the payoffs to Rogers and Lindsay and was not in any way attempting to deceive the grand jury as to this knowledge. This is clear from his testimony only moments later in response to a question from a grand juror -- testimony not mentioned by the district court -- in which Greer explicitly distinguishes between his knowledge at the time of the payments and his later understanding:

> GRAND JUROR: Would you be surprised if you were told that several legislators were paid large sums of money out of the monies received from Mr. Roe and Mr. Brashier?

> GREER: Well, I think it -- I would have been surprised at the time. Certainly in retrospect it would be kind of foolish not to be surprised.

J.A at 2603. As Greer subsequently explained under oath in October of 1995 when specifically asked about his grand jury testimony by defense counsel Lofton, and in response to further questioning in the same hearing, he answered the question put to him before the grand jury, which was whether, at the time of the bribes of Rogers and Lindsay, he was aware of any illegal payments of money in connection with the capital gains bill. J.A. at 1812-14, 1849-50, 1854-55. At the same time, he made clear to the grand jurors in the very same testimony that, although he was not aware of any bribes at or about the time that they occurred, he subsequently became aware of these ille-

gal payments, as did everyone else in the community. **20** In conclusion, the district court clearly erred in its "findings" of perjury by Richard Greer and subornation of that misperceived perjury by Daniel and Barton.

E.

In addition to suggesting that the government had suborned perjury by Greer, the district court also suggested in its order dismissing the indictments that the government had suborned perjury by Cobb and that Special Agent Clemens -- and perhaps AUSA Barton -- had themselves committed perjury before the court. Like the district court's suggestion that Greer perjured himself, these suggestions are without support in the record.

The district court relied on the defendants' allegation that the government allowed Cobb to commit perjury at Taylor's trial when he testified, without correction, that he had never given Senator Lindsay

_____

**20** Greer's testimony is fully consistent with that of Special Agent Davis on July 31, 1991, at Greer's sentencing hearing. At that hearing, Davis testified:

> Your Honor, last Christmas the FBI approached Dick Greer for the first time in connection with our drug investigation of Mr. Greer. This was prior to the Jack Rogers' indictment. At that time, Mr. Greer provided us with information concerning the capital gains tax investigation. Mr. Greer essentially told us that lobbyist Ron Cobb had approached him and told him that he needed more money to payoff both Jack Rogers and Senator Jack Lindsay in connection with the capital gains tax bill. He told us this is the first time that he knew what Ron Cobb-- what he was doing was illegal.

J.A. at 1074. The fact that the defendants omit the final italicized sentence from this testimony when they discuss the issue of Greer's alleged perjury, see Br. of Appellees at 70; compare 956 F. Supp. at 642-43 (district court quoting Davis' statement), all but confirms that even they understand that Greer's grand jury testimony, Davis' testimony, and the government's representations were all consistent. See also Br. of Appellees at 70 (conceding that Greer's testimony, if parsed, can be "plausibly characteriz[ed] . . . as literally true and therefore not perjurious").

57

any "bribes or illegal money." 956 F. Supp. at 639-40. An examination of the record reveals, however, that Cobb consistently maintained that, although he had given money to Lindsay over the years, he did not believe those payments were bribes or were otherwise illegal because he did not think they were made in exchange for specific votes. Thus, while the FBI disagreed with Cobb's conclusion about the legality of his payments to Lindsay, and repeatedly told him and the court as much, it had no basis to question his (Cobb's) subjective belief concerning the payments or their legality.

During the Taylor trial, Cobb was asked on cross-examination whether he "had ever given bribes or illegal money to Senator Lindsay," and Cobb replied, "No, sir, I have not given Senator Lindsay any bribes or illegal money." Id. at 640. Cobb did not deny having made payments to Lindsay, but insisted that, in his view, the payments were not illegal bribes. Indeed, he admitted giving Lindsay "$10,000 all at one time," Br. of United States at 72 (quoting Taylor N.169 at 58), but denied that he thought, or had ever said, that the money was given "in exchange for [Lindsay's] vote or support for a bill for the South Carolina Oil Jobbers Association in 1985 or 1986." J.A. at 439.

This testimony by Cobb was perjurious only if he was misrepresenting his subjective belief as to the purpose and legality of the payments he made to Lindsay. It is, of course, difficult to prove that someone is lying about their subjective beliefs and perceptions. See United States v. Ellis, 121 F.3d 908 (4th Cir. 1997) (noting that an allegation of perjury as to a "matter of perception" fails "absen[t] conclusive proof" that the witness testified falsely as to her belief, rather than that she was merely mistaken in her subjective assessment of the facts). Moreover, the prosecutors in this case suborned perjury only if they actually knew that Cobb was testifying falsely about his subjective beliefs; absent such actual knowledge, the prosecutors did not suborn perjury, even if they suspected or had reason to suspect that Cobb was lying about his view of the payments' legality. Hoke v. Netherland, 92 F.3d 1350, 1360 (4th Cir. 1996).

Because Cobb consistently represented that his payments to Lindsay were not bribes, the prosecutors had no basis for questioning the veracity of Cobb's belief as to the payments' legality. Cobb's

response to the questioning at Taylor's trial was fully consistent with his position throughout the Lost Trust investigation and trials. Cobb always acknowledged that, over the years, he paid Lindsay money in connection with Lindsay's position as a member of the South Carolina Senate. See J.A. at 792 (Cobb testifying that Lindsay had "helped me throughout my entire career, and any time I could make some money and put some money his way, I did").

However, Cobb also adamantly and invariably maintained from the outset of the investigation that he never gave Lindsay money in exchange for a specific vote or any other specific official act. As Cobb explained: "I gave Senator Lindsay money at different intervals, I never gave Senator Lindsay any money for a specific vote. Because he helped me on anything that I was doing. When I was making money, is when I would pass some to him." J.A. at 802. Because Cobb did not believe that the money was given in exchange for a specific quid pro quo, Cobb consistently maintained that it was not a bribe. See, e.g., J.A. at 804 ("[The money paid to Lindsay] was not a bribe, and at no time did I ever buy Senator Lindsay's vote, at no time did I ever bribe Senator Lindsay."); J.A. at 810 ("[Y]ou can quiz me until the Indians come home, but I'm not going to say I bought Senator Lindsay's vote, it didn't happen."). [21]

Cobb thus consistently refused to implicate Lindsay in any wrongdoing, and he made it a condition of his cooperation with the FBI that his testimony not be used to incriminate Lindsay. The FBI and prosecutors, in contrast, made clear to Cobb -- and to the district court -- from the outset that they disagreed with Cobb's characterization of the payments to Lindsay, and that they intended to investigate Lind-

---

[21] After being accused of perjuring himself in the Taylor trial, Cobb took care in the later trials to make clear that he did not believe the payments were bribes, but that the government disagreed. See, e.g., J.A. at 881 ("I have been informed that from my vantage point that I -- I didn't consider it a bribe, from the prosecutor's vantage point, it could be labeled a bribe." (emphasis added)); J.A. at 989 ("I didn't label [the $10,000 payment to Lindsay] a bribe . . . . I gave Senator Lindsay money at different times. I am informed that it is a bribe, but to me it was not a bribe.") (emphasis added). He never wavered from his position that he did not believe that the payments he made were bribes.

59

say fully. See, e.g., J.A. at 846, 881, 989-90. That investigation was ongoing when Lindsay died.

The government's disagreement with Cobb about the ultimate legality of the payments, of course, demonstrates neither that Cobb was, in fact, lying about his own view of the payments nor even that the government believed that he was lying. Certainly, that disagreement is not evidence that the government knew that Cobb was testifying untruthfully about his subjective belief as to the payments' legality. As Barton explained to the district court in 1991,

> Could I prosecute Jack Lindsay for that payment to Tom Magnum? I certainly could. I'm comfortable that I could do that. That doesn't mean that because I am convinced there is a case against Jack Lindsay that Ron Cobb has any understanding as to the illegality of what he did.

J.A. at 846; see also 956 F. Supp. at 640 (quoting affidavit of Special Agent Ronald L. Dick, which states that "Cobb would never allow the payments [he made] to state senator Jack Lindsay to be characterized as bribes. My position on this matter was similar to the old saying that if it walks like a duck, talks like a duck, and looks like a duck, then it must be a duck. After listening to Cobb try to characterize the payments made to Lindsay as anything other than bribery, I remain unconvinced. As an FBI agent, it was clear to me that the monies paid to Lindsay by Cobb were in violation of the Hobbs Act. Cobb, however, would never allow these transactions to be characterized as bribes.").[22] The district court itself recognized in a 1991 hearing that even if everyone involved in the case other than Cobb believed that his payments to Lindsay were bribes, that did not indicate that Cobb

_____

[22] The district court cites to this affidavit as confirming "the defendants' allegations that the government was totally aware of the nature of the Cobb payments to Lindsay." 956 F. Supp. at 640. The district court's reliance on the affidavit as suggesting that the prosecutor suborned perjury merely underscores that the court's 1997 order failed to focus on the critical difference between the government's objective disagreement with Cobb's assessment of the legality of the payments and the government's knowledge as to whether Cobb was misrepresenting his subjective beliefs about those payments.

60

himself believed as much. In response to defense counsel's allegation that Cobb had perjured himself, the court stated:

> THE COURT: Mr. Collins, that is what I am trying to tell you from the outset here when we got involved in this. You might think they are bribes and illegal money or whatever it is and I might think they are bribes and illegal money or whatever it was but Mr. Cobb stuck by the story from the outset. . . . [W]hat I am trying to tell you[is that Cobb] has always been consistent, they were gifts. He never denied that he didn't give [Lindsay] money . . . .

J.A. at 925.

Nevertheless, the district court concluded in its February 1997 order dismissing the indictments that Cobb had perjured himself. J.A. at 63-40, 660. And, while the district court failed to make a specific finding that the government knew that Cobb thought the payments were illegal, it apparently concluded that the government had suborned that perjury.**23**

Curiously, the arguments relied on by the district court in concluding that Cobb's testimony at the Taylor trial was, in fact, perjurious,

_____

**23** The district court concluded that the prosecution "was totally aware of the nature of the Cobb payments to Lindsay," 956 F. Supp. at 634, but allowed this perjured testimony to stand uncorrected. As discussed above, the fact that the prosecution was aware of the facts surrounding Cobb's payments to Lindsay and believed that the payments were probably illegal, is not a sufficient basis for concluding that the prosecution suborned perjury. In the final section of its opinion, the district court also included a conclusory statement that "[t]he court further finds that the government did, in fact, allow testimony from Cobb, Clemens and Greer that it knew to be untrue to stand uncorrected." Id. at 660. This general statement -- made without any record support and without identifying which alleged perjury was being referenced -- cannot fairly be viewed as a finding that the government knew that Cobb was misrepresenting his subjective belief about the nature of his payments to Lindsay, particularly in light of the court's manifest failure in its 1997 order to appreciate the crucial difference between the objective legality of Cobb's payments and his subjective view of their legality.

61

were essentially the same arguments that it heard, considered, and apparently rejected in February of 1991, when the allegation of Cobb's perjury first surfaced. J.A. at 877 (denying defendants' motion to dismiss). During their trial, Blanding and Gordon moved to dismiss their indictment, alleging, in part, that Cobb had perjured himself at Taylor's trial when he denied paying "bribes or illegal money" to Lindsay. J.A. at 606-10. The district court held a detailed and lengthy evidentiary hearing on that motion, and, the following day, denied the motion to dismiss and rejected the defendants' request that Cobb be precluded from testifying at their trials because of his alleged "perjury" at Taylor's trial. 956 F. Supp. at 628.[24]

The district court abruptly reversed course in its February 1997 order. In that order, the district court concluded that Cobb had perjured himself and that the government had suborned that perjury because "[t]he evidence now shows" that 1) Cobb "discussed payoffs in connection with the capital gains tax bill with SA Clemens, with Greer, and in the presence of Randy Lee, all of whom knew that the Cobb payments to Lindsay were, in fact, illegal;" and 2) that Cobb "admitted to SA Richards on May 1, 1989, that he paid $20,000 in illegal monies to Lindsay and Magnum for their influence in passing the oil jobbers bill," and that Richards' polygraph of Cobb confirmed as much. 956 F. Supp. at 640. Despite the district court's intimation that the state of the evidence had changed substantially since its February 1991 hearing on the issue, the basic arguments on which its 1997 ruling were based were rejected by the district court in 1991 and properly so.

The district court's first observation in its 1997 opinion that Cobb discussed "payoffs" to Lindsay with Special Agent Clemens (and others outside the United States government such as Greer) who knew of the payments' illegality demonstrates only that the government knew that Cobb had made payments to Lindsay and that the government believed that those payments were illegal under the Hobbs Act. The government has never contested either of these conclusions. As discussed above, that belief by the government demonstrates neither

_____

[24] Two months later, the district court again rejected the defendants' claims of perjury because "[Cobb] sticks by the same story everywhere he goes." J.A. at 919.

that Cobb was lying about his subjective belief about the payments nor that the government believed that he was.

The district court also appears to have concluded that Cobb actually characterized his payments to Lindsay as illegal payoffs when he described the payments to Special Agent Clemens. In support of that conclusion, the district court cites to a September 25, 1989, FBI 302 of an interview of Cobb by Special Agent Clemens,"in which the payments to Lindsay by Cobb . . . were characterized as `payoffs.'" Id. at 639. However, the fact that the FBI 302 characterizes the payments to Lindsay as "payoffs" does not mean that Cobb himself so characterized the payments. The words recorded in the FBI 302 are the FBI agent's characterization of what Cobb said, not the words that Cobb actually spoke. FBI 302s are "routinely prepared" merely as "the agent's personal summary of the interview to serve to refresh his memory in later preparing a written report of the investigation," United States v. Peterson, 524 F.2d 167, 175 & n.11 (4th Cir. 1975), and are not intended to be verbatim recitations of the interviewee's statements.

Nothing in the Clemens 302 of Cobb indicates that Clemens was attempting to recite verbatim the words that Cobb himself spoke. Rather, Special Agent Clemens -- who believed that the money Cobb gave to Lindsay was an illegal payoff regardless of Cobb's characterization of the payments -- recorded Cobb's statements from his own perspective and thus used the word "payoffs"-- with its attendant connotations of illegality -- to characterize Cobb's payments to Lindsay. Indeed, when interviewed by OPR, Clemens explained that he thought the term "payoff" in the 302 was "more my [Clemens'] term." J.A. at 2739.**25** Even more significantly, the district court itself earlier recognized the crucial distinction between an agent's characterization of what Cobb said and what Cobb actually said and rejected the defense argument that Cobb had necessarily spoken words recorded in the 302s. J.A. at 927; see also J.A. at 757 (district court at the 1991 evidentiary hearing describing the defense perjury argument as resting on the apparent "conflict in [Cobb's] testimony, and what he told

_____

**25** Additionally, Clemens' rough notes for this 302 do not contain the word "pay-off" in the portion dealing with Lindsay's involvement in the capital gains matter. J.A. at 2740 n.20.

63

these agents, or what these agents reduced to writing in these 302's" (emphasis added)). This same logic makes clear that Special Agent Clemens' use of the term "payoff" in his September 25, 1989, FBI 302 does not demonstrate that Cobb called the Lindsay payments a payoff or otherwise believed that they were illegal. **26**

The district court also relied on an interview and polygraph of Cobb, which was conducted by Special Agent Richards, in concluding that Cobb's testimony was perjurious. According to Richards' notes of that May 1, 1989, interview, Cobb "asked Senator Lindsay what it would take to obtain Representative Magnum's vote, and Senator Lindsay told him $20,000, $10,000 of which would be for Representative Magnum and $10,000 for him (Senator Lindsay)." J.A. at 2181 (May 1, 1989, FBI 302 of Ron Cobb). As with the FBI 302s discussed above, however, these notes reflect Agent Richards' characterization of Cobb's testimony, rather than Cobb's own view about the purpose of the payment to Lindsay. No one disputes that Cobb told Richards during the interview and polygraph that he had paid $10,000 to Representative Magnum in exchange for Magnum's vote on the Oil Jobbers Bill, that Senator Lindsay acted as an intermediary for that payment, and that, at the same time that he gave Lindsay $10,000 to give to Magnum, he gave Lindsay $10,000 to keep. However, when Special Agent Richards was specifically questioned at the February 1991 evidentiary hearing about how Cobb had described the purpose of the $10,000 payment to Lindsay, Richards admitted that although he understood that the $10,000 payment to Lindsay was for "getting Representative Magnum's vote," J.A. at 781, Cobb did not indicate to Richard that that was the purpose of the payment, id. And, in fact, Richard testified that the purpose of the payment to Lindsay was not discussed at all. Id. Indeed, when asked whether he believed that Cobb knew he was making illegal payoffs to Lindsay, Richard replied that, while he had explained the Hobbs Act to Cobb at the beginning of the interview and he and Cobb were "talking about payoffs" in the

_____

**26** The identical analysis also applies to the other documents -- mainly FBI internal teletypes -- cited by defendants in their brief. See Appellees' Brief at 59-60. These documents did not purport to recite verbatim Cobb's own description of the payments he made to Lindsay, but rather reflected the FBI's assessment of those payments.

interview generally, J.A. at 787, he "obviously .. . c[ould]n't say what is in a guy's mind," id.

In his testimony at the February 1991 evidentiary hearing Cobb denied that the $10,000 payment was in exchange for Lindsay's securing Magnum's vote and confirmed that he and Richards had not discussed the purpose of the payment to Lindsay. J.A. at 791-92. When pressed about how he would characterize his payment to Lindsay, Cobb described it as a "gift," J.A. at 793, and contrasted it with the $10,000 payment he made to Magnum to buy Magnum's vote, J.A. at 794.

After receiving all of this testimony and hearing argument from the defense, the district court itself was unable to conclude that Cobb had perjured himself, stating that while "it would be farfetched to believe all that we have heard here this afternoon, . . . I don't know that it's that crime of perjury that we are talking about." J.A. at 843. Thus, the district court correctly concluded that while Cobb's testimony was, without any question, "farfetched," there is simply no evidence in the record that he was lying about his subjective belief as to the legality and purpose of his payments to Lindsay. The district court's February 1997 opinion fails to explain why, at that late date, the court concluded otherwise -- and the record does not support the conclusion ultimately reached by the court.**27**

_____

**27** At the 1991 evidentiary hearing the court also heard and considered the fact that Cobb initially failed a polygraph examination given by Richards during the interview regarding the Oil Jobbers bill. In that examination, Cobb was asked whether he had paid Senator Magnum $10,000 through an intermediary. Cobb failed the polygraph until he revealed that Lindsay was the intermediary for the payment to Magnum. 956 F. Supp. at 638. In its order dismissing the indictments, the district court concluded, contrary to its implicit conclusion in 1991, that "[t]his [fact] alone refutes the government's argument that `Cobb has consistently adhered to his subjective view of the facts during the investigation.'" Id.

The fact that Cobb failed the polygraph test when he was concealing the fact that Lindsay served as his intermediary in paying Senator Magnum does not establish, however, that Cobb believed that he had bribed Lindsay. Cobb was not asked during the polygraph whether he had made an illegal payment or bribe to Lindsay; "[t]he issue that [Richard] poly-

F.

In addition to the allegations that the government had suborned perjury by Cobb about Lindsay's involvement in the capital gains matter, the district court also suggested that Special Agent Clemens, and perhaps Assistant United States Attorney Barton, had perjured themselves by denying the existence of an FBI 302 of Cobb discussing the capital gains matter. 956 F. Supp. at 639-40. At the time of the Gordon/Blanding trial, defense counsel asked the government for any 302 about Cobb's involvement in the capital gains matter. Special Agent Clemens testified at the 1991 evidentiary hearing that he did not do an FBI 302 of any interview with Cobb about the capital gains matter and that he did not have any rough notes of such a discussion. J.A. at 836-37. AUSA Barton also told the court that no secret Cobb 302 discussing Lindsay's involvement in the capital gains matter existed that had not been turned over to the defense. J.A. at 657 ("[I]f he's looking for the secret 302 of Ron Cobb where this is discussed, it does not exist. There is no such 302 concerning that . . ."). The government concedes that these statements by Clemens and Barton were, in fact, incorrect. Br. of United States at 81-82. The September 25, 1989, Clemens FBI 302 of Cobb, discussed above, included one paragraph addressing the capital gains matter, and that 302 was not made available to defendants until 1993, after the cases were remanded for retrial. The government contends, however, that neither Clemens nor Barton intentionally misled the court.

The district court did not specifically find that either Clemens or Barton intentionally misrepresented that the FBI 302 did not exist, and we believe that the record does not support the defendants' charges of deliberate misconduct. Instead, the evidence suggests that

_____

graphed [Cobb] on was whether or not he in fact paid Representative Mangum [sic] the $10,000 through the intermediary." J.A. at 778. As Richard explained, Cobb initially failed the polygraph ("showed deception"), not because he refused to admit that he had paid Lindsay an illegal bribe, but because he failed to divulge that Lindsay had acted as an intermediary in the payment to Magnum, and that withholding of information registered on the polygraph.

J.A. at 779.

66

the misstatements by Clemens were the result of oversight, disorganization, and forgetfulness and that Barton never saw the FBI 302 at the time of the original trials. Our conclusion is bolstered by the report of the internal investigation by the Office of Professional Responsibility, which also found that there was no evidence that either Clemens or Barton intentionally misled the court. J.A. at 2742 ("On the central allegation of intentional concealment by the prosecutors, we find the evidence insufficient to support it."); J.A. at 2749 ("[O]ur investigation has developed no evidence that there was any intentional misleading of the court or of the defendant . . . .").

Agent Clemens explained in his OPR interview that he never viewed the FBI 302 as having "any particular significance," J.A. at 2734, and that he "forgot it ever existed," J.A. at 2737. Moreover, Clemens indicated that he was "shocked" when he learned of the 302's existence and that his misstatements to the court were "extraordinarily embarrassing" to him. J.A. at 2738. The district court was apparently skeptical of Clemens' explanation for his misstatements because Lindsay was a "big fish" in South Carolina politics and any suggestion that he was involved in corruption was"explosive" and not likely to be forgotten. 956 F. Supp. at 640. However, as Clemens explained, he knew of Cobb's allegations about Lindsay's involvement in the capital gains matter well before September of 1989 and thus the few isolated statements about the matter in the September 25, 1989, FBI 302 (which focused largely on other matters) could reasonably have slipped his mind. Clemens did not claim that he forgot about Lindsay's alleged involvement in the capital gains matter altogether, but rather only that he forgot that there was a September 1989 FBI 302 that mentioned Lindsay's involvement. Moreover, Clemens indicated that in September of 1989 he was preoccupied with the logistics of the sting operation, J.A. at 2734, and that he did not consider his conversation with Cobb about the capital gains investigation important because the information Cobb provided about Lindsay's connection to the capital gains matter related "only [to] a historical case that we would look at eventually." J.A. at 2738.

As to AUSA Barton, the district court stated only that "AUSA Barton was handling the discovery for the Taylor trial, and any FBI 302 mentioning [inter alia, the capital gains related payment to Senator Lindsay] would certainly have been noticed by him, yet he denied the

67

existence of the `secret 302.'" 956 F. Supp. at 641. Obviously, how-
ever, Barton would only have noticed the FBI 302 if it was provided
to the prosecutors, and thus any finding of deliberate concealment is
necessarily predicated on the assumption that Clemens transmitted the
FBI 302 to the prosecutors. Such an assumption cannot be sustained
on this record. All record evidence indicates that Clemens did not pro-
vide the FBI 302 to the prosecutors until after the trials in question.
Clemens himself indicated that he probably was not passing along to
the AUSAs what Cobb was saying in the Fall of 1989 because Clem-
ens was so busy with the details of the undercover operation. J.A. at
2734. And none of the prosecutors recalls having seen the FBI 302
at the time of the original trials. J.A. at 2742. As the OPR report sum-
marized the evidence:

> Neither SA Clemens nor anyone else from the FBI claimed
> to have transmitted [the September 25, 1989, 302 or the
> June 22, 1989, 302] to the USAO, and no one in the USAO
> remembers having seen [the 302s] during the time that dis-
> covery was being given in the Taylor and Bland-
> ing/Gordon/Derrick cases. In particular, as for the
> September 25, 1989 302, none of the prosecutors involved
> -- AUSA Barton, DuTremble, Daniel, Lydon and Schools
> -- recalled having see it at least while the first several Lost
> Trust cases were being tried.

J.A. at 2742.

The district court never specifically addressed whether AUSA Bar-
ton (or any of the other prosecutors) had received the FBI 302 prior
to the trials. The district court does cite to an August 28, 1990, FBI
internal teletype, which the court apparently believed suggests that
AUSA Barton knew of the FBI 302 in question. The teletype, sent
from FBI-Columbia to FBI-Headquarters, requested authority for lob-
byist Randy Lee to use electronic recording devices to monitor his
conversations with Greer and stated, in part:

> Three CWs hereafter referred to as CW-1 [Lobbyist Lee],
> CW-2 [Senator Lee] and CW-3 [Cobb] have provided infor-
> mation that bribe payments were made to South Carolina
> State Representative John Irby Rogers, III, and South Caro-

68

lina State Senator John Charles Lindsay, in order to ensure the passage of certain capital gains tax legislation in the State of S.C. during the 1988-89 legislative session.

J.A. at 2505. The last page of the teletype also recited that

ASSISTANT UNITED STATES ATTORNEY John Barton is aware of the facts of this case and fully concurs with the use of consensual monitoring. Entrapment is not an issue based upon the facts obtained thusfar.

J.A. at 2508. Of course, one cannot reasonably infer from the fact that AUSA Barton was aware of the "facts" of the capital gains matter that he also knew of the existence of a particular FBI 302 discussing that matter.[28] See OPR Report, J.A. at 2745 ("[W]e find that there is insufficient evidence to show that any prosecutor even knew that [the 302] existed at the time discovery was provided in the first two trials.");[29]

_____

[28] Defendants also cite to two other documents, not relied on by the district court, which they claim indicate that Barton knew of the existence of the FBI 302. See Appellees' Brief at 75. However, both of these documents -- like the FBI teletype discussed above-- indicate, at most, that Barton was aware of Lindsay's involvement in the capital gains matter. Nothing in either document suggests an awareness of a particular FBI document discussing the matter.

[29] The district court also criticizes the government for providing Taylor with redacted versions of the May 1, 1989, Cobb 302 and the August 14-21, 1990, Lee 302. 956 F. Supp. at 640. This criticism is particularly unconvincing in light of the fact that the government redacted the FBI 302s with the knowledge and express approval of the district court. Taylor specifically challenged the redactions to the May 1, 1989, Cobb FBI 302 prior to his trial, and the district court sustained the government's decision to redact the 302. J.A. at 384. After the conclusion of Taylor's trial, the court again rejected counsel's claim that the redaction of the FBI 302 violated Brady. The court explained:

You have to take that argument somewhere else because I don't buy that. They have been redacting things. You probably did when you were an Assistant U.S. Attorney. Nobody ever turned ongoing investigations over to the other lawyer or to the jury or to the public or anybody. I have and I protect innocent people, too, if they are out there.

J.A. at 936. The court's February 1997 order dismissing the indictments does not even attempt to explain the court's about-face on this issue.

<u>cf</u>. Appellees' Brief at 77 (arguing not that Barton had personal knowledge of the FBI 302 at issue, but only that"[h]e <u>knew all about capital gains</u> and had a duty as an officer of the Court to be honest" (emphasis added)).

\* \* \*

We are, as we intimated at the outset of our discussion, reluctant to criticize the district court for its errors, even though we consider them numerous. For, we appreciate well that the countless proceedings leading up to this appeal have spanned the better part of a decade, that the documents generated in connection with this sprawling, multiple-defendant litigation are massive in number, and that the discovery process was oppressive and time-consuming for the court, and would have been so even if the court had confined discovery to that evidence to which defendants were legally entitled. This kind of protracted, zealously prosecuted and defended, record-intensive litigation would challenge the most encyclopedic of minds and try the patience of even the most tolerant. Indeed, both the prosecutors and the defense counsel themselves have had difficulty achieving a command of the voluminous documents generated and produced and reigning in their own understandable frustrations. This said, however, it still falls to this court to ensure that the law is respected. And, for the specific reasons articulated, we find ourselves of the firm conviction that the district court's assertions of intentional misconduct by the government and its prosecutors are simply unsupported by the record before the court, and, accordingly, that the district court clearly erred in its conclusion that the United States engaged in "egregious misconduct" in the trials of these defendants.

IV.

The order of the district court dismissing defendants' indictments is vacated and the case is remanded with instructions to the district court to reinstate the indictments and allow retrial of the defendants by the United States.

<u>VACATED AND REMANDED</u>

WIDENER, Circuit Judge, concurring:

I concur in the opinion of the panel.

I concur in that opinion because I think it is of some consequence that there be an opinion of the court instead of merely majority and concurring opinions, and more especially because the parties have requested our review of the record.

I would add a word, however. Left to my own devices, I am of opinion that the action of the district court, in its examination and criticism in this case of the government's handling of the similar but unrelated investigation of the capital gains tax legislation, was so far beyond its warrant that I would have vacated all of those findings for that reason without further consideration.